UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____ )
                                 )
JAMES ELLIS and WILLIAM PERRY    )
                                 )     Case No.: 1:15-cv-14128-WGY
        Plaintiffs,              )
                                 )     **ORAL ARGUMENT REQUESTED**
            v.                   )
                                 )
FIDELITY MANAGEMENT TRUST        )
COMPANY,                         )
                                 )
          Defendant.             )
_____ )


**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS THE COMPLAINT**

Brian D. Boyle (*pro hac vice*)
Gregory F. Jacob (*pro hac vice*)
Meaghan VerGow (*pro hac vice*)
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300

John J. Falvey, Jr. (BBO# 542674)
Alison V. Douglass (BBO# 646861)
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
Tel: (617) 570-1000

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

BACKGROUND .................................................................................................... 3

LEGAL STANDARD............................................................................................. 4

ARGUMENT ......................................................................................................... 4

    I.    PLAINTIFFS' CORE ALLEGATION THAT MIP WAS MANAGED MORE CONSERVATIVELY THAN AVERAGE STABLE VALUE PRODUCTS DOES NOT STATE A CLAIM FOR IMPRUDENCE .................. 4

        A.    Prudence Challenges Are Evaluated Based On The Fiduciary's Conduct, Not Results ............................................................................. 6

        B.    Plaintiffs Do Not Allege Procedural Imprudence, Nor Do They Plead Facts From Which Procedural Imprudence Can Be Inferred........... 9

            1.    Plaintiffs' Hindsight-Based Theory That More Risk Would Have Paid Off Does Not Support A Claim For Imprudence ......... 9

            2.    Plaintiffs' Theory That Stable Value Funds Could Invest Aggressively Without Adding Risk Is Implausible And Undercut By Plaintiffs' Own Allegations.................................... 10

        C.    ERISA Does Not Prohibit Investment Fiduciaries From Pursuing A Fully Disclosed Approach That Differs From The Average .................. 12

            1.    Precluding Stable Value Fund Managers From Conservative Management Would Be Contrary To The Purposes of ERISA ..................................................................... 12

            2.    Fidelity's Disclosure Of The Level Of Risk Of MIP's Underlying Investments Enabled Plan Fiduciaries And Participants To Evaluate Whether It Suited Their Plan Design And Retirement Needs.................................................... 14

        D.    Plaintiffs' Wrap Fee Allegations Must Be Dismissed Because Plaintiffs Do Not And Cannot Allege That The Fees Exceeded Market Rates .................................................................................... 16

    II.    PLAINTIFFS' EXCESSIVE FEE ALLEGATIONS MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT AND CANNOT ALLEGE THAT FIDELITY BREACHED ANY FIDUCIARY DUTY WITH RESPECT TO SETTING MIP'S FEES ................................................ 17

    III.    PLAINTIFFS' CLAIM IS TIME BARRED TO THE EXTENT IT COMPLAINS ABOUT LINGERING EFFECTS OF ALLEGED CONDUCT OCCURRING MORE THAN SIX YEARS BEFORE SUIT ......... 19

CONCLUSION....................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abbott v. Lockheed Martin Corp.*,
    725 F.3d 803 (7th Cir. 2013) .............................................................................................13

*Abbott v. Lockheed Martin Corp.*,
    No. 06-cv-0701-MJR, 2009 U.S. Dist. LEXIS 26878 (S.D. Ill. Mar. 31, 2009) ....................13

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
    446 F.3d 728 (7th Cir. 2006) ........................................................................................7, 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................................4

*Board of Trs. of the Operating Eng'rs Pension Trust v. J.P. Morgan Chase Bank, N.A.*,
    No. 09 Civ. 9333 (BSJ), 2012 WL 1382274 (S.D.N.Y. Apr. 20, 2012)..................................10

*Board of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*,
    No. 09 Civ. 6273 (RMB), 2010 WL 1558587 (S.D.N.Y. Apr. 14, 2010), *vac'd on other grounds by* 2010 WL 3958790 (S.D.N.Y. Sept. 7, 2010) ...........................................9

*Bruner v. Boatmen's Trust Co.*,
    918 F. Supp. 1347 (E.D. Mo. 1996).....................................................................................11

*Bunch v. W.R. Grace & Co.*,
    555 F.3d 1 (1st Cir. 2009).........................................................................................6, 7, 8, 9

*Caterino v. Barry*,
    8 F.3d 878 (1st Cir. 1993)....................................................................................................7

*In re Citigroup ERISA Litig.*,
    662 F.3d 128 (2d Cir. 2011).................................................................................................7

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*,
    228 F.3d 24 (1st Cir. 2000)..................................................................................................6

*Dupree v. Prudential Ins. Co. of Am.*,
    No. 99-8337-CIV.-JORDAN, 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ..........................16

*Edes v. Verizon Commc'ns.*,
    417 F.3d 133 (1st Cir. 2005)...............................................................................................19

*García-Catalán v. United States*,
    734 F.3d 100 (1st Cir. 2013)................................................................................................4

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Geller v. Cty. Line Auto Sales, Inc.*,
   86 F.3d 18 (2d Cir. 1996) ................................................................................ 13

*General Motors Corp. v. Tracy*,
   519 U.S. 278 (1997) ........................................................................................ 7

*Glennie v. Abitibi-Price Corp.*,
   912 F. Supp. 993 (W.D. Mich. 1996) ............................................................ 11, 12

*Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*,
   961 F. Supp. 2d 393 (D. Conn. 2013) ............................................................ 18

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) .......................................................................... 16, 18

*Jenkins v. Yager*,
   444 F.3d 916 (7th Cir. 2006) .......................................................................... 12

*Jones v. Harris Assocs.*,
   559 U.S. 335 (2010) ........................................................................................ 7

*Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*,
   173 F.3d 313 (5th Cir. 1999) .......................................................................... 12

*Lanka v.O'Higgins*,
   810 F. Supp. 379 (N.D.N.Y. 1992) ................................................................ 12

*Loomis v. Exelon Corp.*,
   658 F.3d 667 (7th Cir. 2011) .......................................................................... 15

*McCaffree Fin. Corp. v. Principal Life Ins. Co.*,
   No. 15-1007, 2016 WL 98332 (8th Cir. Jan. 8, 2016) .................................. 18

*McLemore v. Regions Bank*,
   682 F.3d 414 (6th Cir. 2012) .......................................................................... 14

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v.
Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ...................................................................... *passim*

*Renfro v. Unisys*,
   671 F.3d 314 (3d Cir. 2011) ........................................................................... 18

*Riley v. Metro. Life Ins. Co.*,
   744 F.3d 241 (1st Cir. 2014) .......................................................................... 19

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co.*,
  768 F.3d 284 (3d Cir. 2014)...................................................................................18

*Schatz v. Republican State Leadership Comm.*,
  669 F.3d 50 (1st Cir. 2012)......................................................................................6

*State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
  842 F. Supp. 2d 614 (S.D.N.Y. 2012).....................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................................5, 6

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996)....................................................................................7, 11

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
  325 F. App'x 31 (2d Cir. 2009)................................................................................17

## STATUTES

29 U.S.C. § 1002(21)(A)(i)...........................................................................................18

29 U.S.C. § 1002(21)(A)(iii).........................................................................................18

29 U.S.C. § 1104(a)(1)(B) ............................................................................................6

29 U.S.C. § 1113(1) ......................................................................................................19

## RULES

Fed. R. Civ. P. 12(b)(6)..................................................................................................1

## REGULATIONS

17 C.F.R. § 270.2a-7(c)(3).............................................................................................15

29 C.F.R. § 404c-1(b)(1)(ii)...........................................................................................3

29 C.F.R. § 404c-1(b)(2)................................................................................................3

29 C.F.R. § 404c-1(b)(3)................................................................................................3

29 C.F.R. § 2550.404a-2................................................................................................14

29 C.F.R. § 2550.404a-5................................................................................................14

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**FEDERAL REGISTER**

72 Fed. Reg. 60,452 (Oct. 24, 2007)..........................................................................................3, 10

75 Fed. Reg. 10,060 (Mar. 4, 2010)..........................................................................................15

75 Fed. Reg. 64,942 (Oct. 20, 2010)..........................................................................................14

Defendant Fidelity Management Trust Company ("Fidelity") submits this Memorandum in Support of Its Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6).  The Complaint fails to state a claim as a matter of law under the Employee Retirement Income Security Act of 1974 ("ERISA").

## INTRODUCTION

Plaintiffs allege that Fidelity breached its fiduciary duty of prudence because it managed an investment concededly intended to be "safe" according to a conservative investment strategy that it transparently disclosed.  The Complaint accepts that stable value funds generally function as the "safe" option for 401(k) plans, with an "overriding objective" of preserving principal and an "additional" goal of generating steady positive returns "substantially higher than a money market fund."  Compl. ¶¶ 20, 26, 28.  This is not a case about whether Fidelity fulfilled that goal. Plaintiffs do not deny (and the materials they incorporate confirm) that the Fidelity Managed Income Portfolio ("MIP") preserved plan participants' principal and earned interest many multiples higher than money market returns in every quarter of the class period.  Plaintiffs allege, however, that MIP could have delivered even higher returns if Fidelity had injected more risk into the fund.  In short, they claim that MIP was *too* safe.

ERISA does not countenance such a broadside attack on a fully disclosed investment strategy based on a hindsight review of performance results.  Investment managers must exercise judgment that requires a balancing of competing interests when making investment decisions. Courts recognize they are not well positioned to second-guess those investments decisions by reweighing their pros and cons, and accordingly require plaintiffs to identify flaws in the process employed by an investment fiduciary in order to state a valid ERISA claim.  But plaintiffs here identify no such flaws, nor do they allege any facts from which procedural imprudence can plausibly be inferred.  They simply allege MIP should have taken on more risk:  it should have

held riskier securities with greater (hence riskier) durations, in the hope of achieving greater returns.

This is a classic hindsight challenge, which cannot survive a motion to dismiss.  When Fidelity decided to offer the 401(k) plan market a stable value option with a conservative profile, neither Fidelity nor the plan sponsors that selected it could have known whether market conditions in succeeding years would make that strategy a winner or a loser compared to other funds that assumed more risk.  But those risks are indisputably real:  the Complaint itself faults Fidelity for using an excessively risky strategy prior to 2009 that (it says) caused MIP investors long-term losses, and plaintiffs' counsel is currently litigating a case against JPMorgan for allegedly offering stable value funds that took excessive risks.  Wrap contracts insure against catastrophic losses, but wrap providers can and do fail (AIG, one of MIP's wrap providers, nearly failed in 2008), and in any event the Complaint accepts that wrap contracts do not guarantee earning interest, meaning that losses can drive a fund's returns down to zero.  Plan sponsors have every right to offer their participants an investment option designed to avoid those risks, and Fidelity's decision to strike a particular risk/reward trade-off by managing MIP to a conservative profile does not plausibly give rise to an inference of procedural imprudence.

Plaintiffs' allegation that Fidelity "disguised" MIP's allegedly poor performance by using a benchmark that was "misleading" is makeweight.  Plaintiffs miss a crucial fact:  The comparator against which Fidelity reported MIP returns beginning in 2011 was the ***Department of Labor's model*** for stable value funds under the very disclosure regulations the Complaint invokes, and the benchmark MIP used earlier in the class period had a virtually identical return profile.  Far from being "misleading," Fidelity's use of a conservative benchmark communicated to participants its conservative management of the fund.

Finally, the Complaint's remaining allegations concerning excessive fees are without merit, and in any event barred by the statute of repose.  The excessive management fee claim does not viably allege a breach of fiduciary duty and, moreover, complains about a fee that was established before the class period and never changed.  The claim that Fidelity negotiated excessive wrap contract fees with third parties is insufficient as a matter of law because it does not—and cannot—allege that MIP paid fees higher than ordinary market rates.  Claims that purport to challenge the consequences of conduct prior to the repose period are time-barred.

## BACKGROUND

Defined contribution plans, including 401(k) plans, enable employees to save for retirement by investing pre-tax dollars through individual accounts.  Compl. ¶ 10.  Plan fiduciaries select a lineup of investment options—generally a minimum of three, under Department of Labor ("DOL") regulations—and plan participants can then allocate their accounts among those options to suit their objectives and needs.  Compl. ¶¶ 10, 19, 22.  DOL regulations provide that at least one option in an investment lineup should be "safe," *id.*, ¶ 20, *viz.*, an "income producing, low risk, liquid" investment.  29 C.F.R. § 404c-1(b)(1)(ii), (b)(2), (b)(3).

The DOL has identified stable value funds as an investment that, like money market funds, functions as a "capital preservation vehicle[]."  Default Investment Alternatives Under Participant Directed Individual Account Plans, 72 Fed. Reg. 60,452, 60,461-63 (Oct. 24, 2007).  Plan fiduciaries thus frequently select stable value funds as the "safe" option.  Compl. ¶ 20.  Stable value funds may be structured in a variety of ways.  *Id.* ¶¶ 23-25.  Fidelity's MIP uses a structure whereby the investment manager maintains a portfolio of fixed income investments, and investors earn income based on the yield of the underlying securities, amortized (or

"smoothed") over time.  *Id.* ¶¶ 25, 27, 29-33.  The return received by the investor (after the actual yield is "smoothed") is called the crediting rate.  *Id.* ¶¶ 29-30, 32-33.

Stable value funds acquire "wrap" coverage (for which they pay) from insurance companies and banks.  *Id.* ¶¶ 29, 54.  The wrap contracts are a form of catastrophic insurance that ensures that investors generally can withdraw their investments from the fund at their "book" (or "contract") value—principal plus the interest accrued at the credited rate—even if the market value of the fund's holdings is lower.  *Id.* ¶¶ 30-31.  Those wrap guarantees are only as good as the bank or insurance company that issued the wrap is creditworthy.  *Infra* at 11-12.  Moreover, wrap contracts do not guarantee that investors will earn income on a going-forward basis.  Compl. ¶¶ 29-30.  Rather, whether a stable value fund delivers a crediting rate above zero is principally a function of how the underlying portfolio performs—and if the portfolio performs poorly, investors will experience those poor returns in the form of sustained low (or even zero) crediting rates.  *Id.* ¶¶ 27, 29-30, 33, 43, 66-67.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain "factual allegations [that] are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged."  *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quotation omitted); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

**I.   PLAINTIFFS' CORE ALLEGATION THAT MIP WAS MANAGED MORE CONSERVATIVELY THAN AVERAGE STABLE VALUE PRODUCTS DOES NOT STATE A CLAIM FOR IMPRUDENCE**

Plaintiffs allege that MIP was managed too conservatively.  Every allegation in the Complaint relating to Fidelity's management of MIP—that MIP invested in too high a proportion of Treasuries, that the average duration of its securities was too low, and that, in retrospect, it

could have had higher returns had it been managed more aggressively—is just a variation on this single theme. The plausibility of this claim must be considered in the context of what ERISA, the DOL, and the Complaint itself say about "safe" retirement options such as stable value funds.

Stable value funds often serve as the "safe" option in a 401(k) plan. Compl. ¶¶ 19-20. The Complaint acknowledges that such safe options are an "essential investment alternative" in 401(k) plans because they allow investors to "move out of equity investments during periods of high market volatility," and allow "retirees, who cannot 'ride out' the down periods in a market cycle," to "protect the value of their retirement savings." *Id.* ¶ 22.

The Complaint sets forth specific criteria that stable value funds should be designed to meet. The Complaint alleges that the "overriding objective" in managing a stable value fund is "preservation of principal," with secondary aims of liquidity and "earning a fairly stable return which exceeds that of shorter maturity alternatives." *Id.* ¶¶ 18, 26 (quotation omitted). Plaintiffs do not dispute, and in light of the materials on which the Complaint relies cannot dispute, that ***MIP met every one of these criteria***: it was diversified, it preserved capital, and it provided consistent returns to participants many times higher than the returns of a money market account.[1] *See generally* Declaration of Meaghan VerGow in Support of Defendant's Motion to Dismiss the Complaint ("VerGow Decl.") Ex. A (MIP fund fact sheets throughout the class period) (incorporated by Compl. ¶ 56)[2]; *see also* Compl. ¶ 56.

---

[1] Some paragraphs in the Complaint could be read to suggest plaintiffs are alleging that a stable value fund must be invested exclusively in intermediate-term bonds. *E.g.*, Compl. ¶ 25. Elsewhere in the Complaint, however, plaintiffs acknowledge that stable value funds do not limit their holdings to intermediate-term bonds, but rather typically also hold a substantial proportion of securities with shorter durations, such as U.S. Treasuries ***and cash***. *E.g.*, *id.* ¶ 51 (alleging that in 2012 pooled stable value fund portfolios were invested 25% on average in U.S. Treasuries).

[2] On a motion to dismiss, a court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor*

Plaintiffs nevertheless contend that Fidelity breached its fiduciary duty of prudence by adopting an "excessively-conservative" investment strategy for MIP. Compl. ¶ 51. Plaintiffs allege that because other stable value funds took more risk and had higher yields in recent years, it was imprudent for MIP not to have done so, too. *Id.* ¶¶ 50-51. Specifically, plaintiffs allege that the average duration of the securities held by MIP was too low—they allege that stable value funds typically hold securities with average durations of 2 to 4 years, and that MIP's average durations in 2009 (2.2 years) and 2010 (2.3 years) were "at the very bottom of the range of typical" for stable value funds. *Id.* ¶ 50. Similarly, plaintiffs allege that MIP's investment in U.S. Treasuries was too high because, while other pooled stable value funds held a substantial portion of them in 2011 and 2012 (22% and 25% on average, respectively), MIP held more than the average (43.7% and 46% those years). *Id.* ¶ 51. Plaintiffs allege that MIP's conservative strategy caused it to have lower returns than stable value funds that held securities with longer average durations and fewer Treasuries. *Id.* ¶ 53, 97, 100. These allegations all boil down to a central contention that ERISA ***required*** Fidelity to adopt a riskier investment strategy for MIP. That theory is meritless.

## A.     Prudence Challenges Are Evaluated Based On The Fiduciary's Conduct, Not Results

ERISA requires fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *see Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st

---

*Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *accord Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000). Those documents may "trump the complaint's allegations if a conflict exists." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 n.3 (1st Cir. 2012).

Cir. 2009).  In the context of investment management, courts have explained that this standard "focus[es] on a fiduciary's ***conduct*** in arriving at an investment decision, ***not on its results***, and ask[s] whether a fiduciary employed the ***appropriate methods*** to investigate and determine the merits of a particular investment."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (emphasis added; alterations in original; quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)); *Bunch*, 555 F.3d at 7 (test of prudence "is one of conduct, and not a test of the result of performance of the investment.").  A fiduciary's decisions must be judged "based upon information available to the fiduciary at the time of each investment decision and ***not from the vantage point of hindsight***."  *St. Vincent*, 712 F.3d at 716 (emphasis added; quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011)).

The necessary corollary to this process-focused standard is that ERISA does not ask the court to "simply substitute [its] judgment" for that of the fiduciaries, *Caterino v. Barry*, 8 F.3d 878, 833 (1st Cir. 1993) (Breyer, C.J.), recognizing that courts, while well-equipped to assess process, are less suited to make "economic predictions," *Jones v. Harris Assocs.*, 559 U.S. 335, 352-53 (2010) (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 308 (1997)).  ERISA recognizes that fiduciaries must exercise judgment and discretion when, as here, they are "balancing … competing interests under conditions of uncertainty."  *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006).  In evaluating challenges to such exercises of judgment and discretion, ERISA thus looks to whether the process was "thorough" and whether the "relevant factors" were considered, but it does not ask the court to decide whether the court would have balanced the competing interests in the same way the fiduciary did, nor is it

concerned with "whether the best possible action was taken" by the fiduciary.  *Bunch*, 555 F.3d at 7.

The alternative would be to seat fiduciaries "on a razor's edge" in their investment decisions.  *Armstrong*, 446 F.3d at 733.  This Complaint, read side-by-side with plaintiffs' counsel's filing in *In re JPMorgan Chase Stable Value Fund ERISA Litigation*, neatly illustrates why the "razor's edge" is an impossible standard to meet.  Here, plaintiffs allege that Fidelity managed its stable value fund too conservatively; there, plaintiffs assert that JP Morgan managed its stable value funds too aggressively.  Here, plaintiffs allege that "returns ***substantially higher*** than a money market fund are an essential characteristic of stable value funds," Compl. ¶ 28 (emphasis added); there, plaintiffs assert that stable value funds should "yield[] returns ***slightly higher*** than a money market account."  Consolidated & Amended Complaint, *In re JPMorgan Chase Stable Value Fund ERISA Litig.*, No. 12-cv-2548 (S.D.N.Y. Dec. 16, 2014), ECF No. 182 ("JPM Compl.") (attached as VerGow Decl. Ex. B) ¶ 4 (emphasis added).  Here, plaintiffs allege Fidelity should have injected more risk into MIP, Compl. ¶¶ 57, 94; there, plaintiffs assert "a relatively low-risk profile is in order."  JPM Compl. ¶ 62; *see also* JPM Compl. ¶ 4 ("stable value funds must be managed to minimize the risk to the invested principal and to minimize volatility").  Here, plaintiffs allege Fidelity should have adopted and attempted to beat a more aggressive benchmark, Compl. ¶¶ 56-57, 65; there, plaintiffs allege the opposite.  JPM Compl. ¶ 76 ("the basic purposes of a stable value fund … are absolute (preserving principal and achieving consistent returns) rather than relative (performing better than a particular benchmark)").

Indeed, plaintiffs would seat this court on a razor's edge by seeking an injunction that would require the Court to decide how to balance risk and return, an unenviable task for even an experienced investment manager in this time of market volatility.

**B.      Plaintiffs Do Not Allege Procedural Imprudence, Nor Do They Plead Facts From Which Procedural Imprudence Can Be Inferred**

Plaintiffs do not allege that Fidelity failed to approach its management of MIP with the rigor, care, and thought of a prudent manager.  Because the Complaint is devoid of "allegations relating directly to the methods employed by the ERISA fiduciary," *St. Vincent*, 712 F.3d at 727, it may survive a motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed."  *Id*. at 718 (quotation omitted).  Plaintiffs advance two theories by which they propose to infer an imprudent process: First, that other, less conservative stable value managers obtained higher returns, and second, that in light of the wrap contracts, a conservative approach was not necessary.  Neither theory has merit.

*1.      Plaintiffs' Hindsight-Based Theory That More Risk Would Have Paid Off Does Not Support A Claim For Imprudence*

Plaintiffs allege that other stable value managers took more risk, and did so successfully. Compl. ¶ 53.  This is the very definition of improper evaluation by hindsight.  *Bunch*, 555 F.3d at 7.  It is the most basic principle of investing that additional risk creates greater opportunity for both reward and loss.  The fact that it came to pass that those who took more risk during the class period may have enjoyed more reward says nothing at all "about how a prudent investor would have viewed the [p]ortfolio's securities ***at the relevant times***."  *St. Vincent*, 712 F.3d at 723 (emphasis added); *see Board of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, No. 09 Civ. 6273 (RMB), 2010 WL 1558587, at *3-6 (S.D.N.Y. Apr. 14, 2010), *vac'd on other grounds by* 2010 WL 3958790 (S.D.N.Y. Sept. 7, 2010); *Board of Trs. of*

*the Operating Eng'rs Pension Trust v. J.P. Morgan Chase Bank, N.A.*, No. 09 Civ. 9333 (BSJ), 2012 WL 1382274, at *4 (S.D.N.Y. Apr. 20, 2012).  Even a precipitous decline in price (rather than, as alleged here, failure to earn as much as other investors) does not create a reasonable inference of imprudence, unless there are "***other alleged facts***" demonstrating that the investment decision was unsound ***at the time***—without the benefit of 20/20 hindsight.  *St. Vincent*, 712 F.3d at 721-22.  No other facts are alleged here:  the Complaint alleges only that the risk/return trade-off turns out with hindsight to have favored a somewhat riskier approach.[3]

> 2.     *Plaintiffs' Theory That Stable Value Funds Could Invest Aggressively Without Adding Risk Is Implausible And Undercut By Plaintiffs' Own Allegations*

Plaintiffs' second theory is that Fidelity could have made riskier investments for MIP without incurring a commensurate risk of loss because of the fund's wrapped structure.  Compl. ¶ 35.  That is incorrect, as the Complaint elsewhere acknowledges.

Wrap coverage protects investors against the risk of lost principal in the event that catastrophic circumstances leave the fund without adequate capital to pay out investors at "book value," that is, invested principal plus interest accrued at the crediting rate.  *Supra* at 4.  Wrap

---

[3] Plaintiffs' performance critique also compares apples and oranges.  Among other things, plaintiffs improperly compare MIP's crediting rate to an index that includes crediting rates from pooled funds structured in ways that create a higher potential for returns but that shift a higher risk of insurer insolvency to the participants.  *E.g.*, Compl. ¶ 63; VerGow Decl. Ex. A, at  11, 19, 27 (showing MIP held no assets in insurance company GICs at end of 2010, 2011, or 2012); *id.* Ex. C, at 10 (incorporated by Compl. ¶¶ 50-51) (industry survey showing the average pooled fund had assets tied up in traditional GICs).  Plaintiffs also inappropriately suggest MIP should have had the same returns as the Barclays U.S. 1-5 Government/Credit Index, Compl. ¶¶ 64, without acknowledging fundamental differences between that more volatile index and a stable value vehicle.  For example, plaintiffs fail to account for the fact that stable value returns are impacted by wrap fees and crediting rate smoothing.  Finally, Plaintiffs do not advance their imprudence claim by alleging that MIP's returns were lower than inflation.  *Id.* ¶¶ 6, 62.  Very conservative investments not infrequently have yields lower than the inflation rate, yet the DOL has recognized that capital preservation vehicles such as stable value funds and even money market funds are integral components of a retirement portfolio, even if their lower potential for returns means most retirement savers should not commit their entire accounts to them.  72 Fed. Reg. at 60,461-63.

contracts do not guarantee investors a crediting rate above zero, however; the crediting rate that investors earn is principally a function of the performance of the underlying portfolio. *Supra* at 4. If a stable value fund's portfolio performs poorly, the crediting rates suffer, and the fund may even have to hold the crediting rate at zero for a period, such that investors accrue no interest. Compl. ¶¶ 30, 33, 43. Simply put, stable value funds do not magically avoid the principle of investment economics that seeking the opportunity for greater returns requires taking greater risk—as plaintiffs acknowledge in alleging that MIP's allegedly "imprudently risky investment strategy" prior to 2009 caused "the Plans that invested in it to suffer damage." *Id.* ¶¶ 43, 94. If Fidelity had managed MIP to a riskier strategy, participants might have earned higher returns—if that risk paid off. *Or* they might have earned less, if the risk did not. *Id.* ¶ 43. But the wrap contracts did not protect investors from the low returns a riskier strategy could have produced.

Fidelity's attention to the integrity of the investments in the MIP portfolio was inescapably prudent for an additional reason: the wrap contracts do not provide airtight protection for the investors' book value. *See, e.g.*, VerGow Decl. Ex. A, at 49 (explaining that wrap contracts do not guarantee capital preservation for certain types of plan withdrawals); *id.* Ex. D, at 267 ("Stable Value Handbook") (incorporated by Compl. ¶¶ 26-27) (wrap contracts usually do not cover defaulted securities). Among other things, insurers can and do fail, and when they do, stable value investors risk being left with only the market value of their investments. *See id.* This is not a hypothetical risk. The failures of Executive Life Insurance Company and other insurers directly affected large numbers of stable value investors. *See, e.g.*, *In re Unisys Sav. Plan Litig.*, 74 F.3d 420 (3d Cir. 1996) (Executive Life); *Bruner v. Boatmen's Trust Co.*, 918 F. Supp. 1347, 1349 (E.D. Mo. 1996) (same); *Glennie v. Abitibi-Price Corp.*, 912

F. Supp. 993, 995 (W.D. Mich. 1996) (Mutual Benefit Life Insurance Company).  In the most

recent financial crisis, one of the most widely-used wrap providers, AIG, was one federal bailout

away from collapse.  In short, the existence of wrap contracts adds nothing to the hindsight

allegation as to how the risk/reward calculus in fact played out.

### C.       ERISA Does Not Prohibit Investment Fiduciaries From Pursuing A Fully Disclosed Approach That Differs From The Average

An investment manager has latitude under ERISA to manage a fund for 401(k) plans

according to an investment strategy that has been transparently disclosed, even when that

disclosed strategy differs from that of the "average" investment manager.  *See, e.g.*, *St. Vincent*,

712 F.3d at 725 (affirming dismissal of imprudent management claim where the complaint "does

not even assert … that the share of mortgage-backed securities in the [designated benchmark]

reflects an upper limit on the percentage of mortgage-backed securities that can be held in a

properly diversified ERISA plan").[4]  Indeed, ERISA encourages a range of investment strategies.

*See, e.g.*, *Jenkins v. Yager*, 444 F.3d 916, 925-26 (7th Cir. 2006) (explaining that,

notwithstanding "years of lower performance," "investment strategy" of "find[ing] long-term,

conservative, reliable investments that would do well during market fluctuations" was neither

"unreasonable [n]or imprudent").

### 1.       *Precluding Stable Value Fund Managers From Conservative Management Would Be Contrary To The Purposes of ERISA*

As noted above, plaintiffs concede that MIP met the basic criteria of a stable value fund;

their critique is that it was at the conservative end of the "typical" range.  Compl. ¶ 50.  The

---

[4] *See also, e.g.*, *Lanka v. O'Higgins*, 810 F. Supp. 379, 387-88 (N.D.N.Y. 1992) (plaintiffs failed to establish imprudence of "contrarian investment philosophy" that was disclosed to plan trustee); *Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 320 (5th Cir. 1999) (investment decision was not imprudent where there were no deficiencies in manager's investigation and the decision did not violate disclosed "investment guidelines").

notion that deviation from the "average" is imprudent is unsound policy and contrary to the goals of ERISA.[5]  History is full of examples where the majority approach to investing resulted in tremendous losses; the cases arising out of the financial crisis of 2008 provide ample illustrations.  Moreover, imposing a rule that it is imprudent not to manage a fund to average characteristics would reduce the diversity of choices available to plan sponsors for their lineups, and eliminate the more conservative end of the spectrum.  Plan fiduciaries would be limited to a stable value fund with "average" risk characteristics, even if a more conservative option would be more suitable for their plan and participants.

To Fidelity's knowledge, no court has ever held an investment manager imprudent for having pursued a ***conservative*** investment strategy for a 401(k) plan fund that was openly disclosed to plans and participants.  Imprudence challenges to the conduct of investment managers have, with only a handful of exceptions, focused on decisions alleged to be unduly ***risky***.[6]  This focus on excessive riskiness comports with ERISA, the paramount concern of which is protecting retirement assets against loss.[7]

_____

[5] There may be instances in which the difference between the subject fund and similarly-labeled funds is so extreme that the fund no longer even meets the basic criteria of stable value and, as such, may support a claim for imprudence.  In *Lockheed*, a fund designated as "stable value" was invested in up to 99% in money market investments, leading the defendant's Managing Director to say that the fund "has become a money market fund" and should change its name "to avoid false advertising."  *Abbott v. Lockheed Martin Corp.*, No. 06-cv-0701-MJR, 2009 U.S. Dist. LEXIS 26878, at *26-31 (S.D. Ill. Mar. 31, 2009); *see also Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806, 810-11 (7th Cir. 2013).  No such allegations are made here; to the contrary, MIP concededly meets all of the ordinary criteria of a stable value fund.

[6] *See, e.g.*, *State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 646-49 (S.D.N.Y. 2012) (investment manager, "without disclosing its intention to do so," managed bond funds "to accept risks significantly beyond those of 'an enterprise of a like character and with like aims.");  *St. Vincent*, 712 F.3d at 725 (affirming the dismissal of a complaint alleging that an investment manager excessively weighted the portfolio in risky mortgage-backed securities, where the plaintiff alleged no deviation from the portfolio's investment guidelines).

[7] *See, e.g.*, *Geller v. Cty. Line Auto Sales, Inc.*, 86 F.3d 18, 22 (2d Cir. 1996) ("ERISA is a

Plaintiffs' attack on MIP's allegedly conservative investment strategy is particularly ill-conceived for an investment option that, by design, is intended to serve as the "safe" option. Indeed, the DOL has indicated that a very conservative approach to managing stable value funds is entirely appropriate by identifying a conservative benchmark for judging their performance. Effective December 2010, the DOL selected the 3-Month U.S. Treasuries Bill Index as the model benchmark for stable value funds when it promulgated the participant disclosure regulation cited in the Complaint (29 C.F.R. § 2550.404a-5, *see* Compl. ¶ 57).[8]  *See* Appendix to Sec. 2550.404a-5: Model Comparative Chart, 75 Fed. Reg. 64,942, 64,942-43 (Oct. 20, 2010). This guidance confirms the regulator's expectation that stable value investments will be managed in a manner that makes their returns comparable to the 3-Month T-Bill, a short-term debt security that is commonly included in money market portfolios with a duration of (as its name suggests) three months.  *Id.*  That is in fact the expectation of plaintiffs' own counsel, as alleged in the *JPMorgan* litigation.  *Supra* at 8.

> 2.      *Fidelity's Disclosure Of The Level Of Risk Of MIP's Underlying Investments Enabled Plan Fiduciaries And Participants To Evaluate Whether It Suited Their Plan Design And Retirement Needs*

Plaintiffs do not and cannot allege that Fidelity failed to disclose the fund's investment strategy.  On the contrary, the fund fact sheets referred to in the Complaint show that Fidelity disclosed MIP's investment objective (to "preserve your principal investment while earning a level of interest income that is consistent with principal preservation"), as well as the key metrics

---

remedial statute enacted to protect the interests of beneficiaries of private retirement plans by reducing the risk of loss of pension benefits."); *McLemore v. Regions Bank*, 682 F.3d 414, 428 (6th Cir. 2012) ("The primary purpose of ERISA is to protect the individual who has a pension or health plan from certain kinds of losses."); *Armstrong*, 446 F.3d at 733 ("A trustee is not an entrepreneur…. He is supposed to be careful rather than bold.").

[8] The Complaint refers to "29 C.F.R. § 2550.404a-2," but Fidelity assumes plaintiffs mean to refer to the 29 C.F.R. § 2550.404a-5, the regulation that imposes the rule they describe.

that reflected the fund's level of conservatism:  the types of securities held by the fund (U.S. Treasuries, corporate bonds, asset-backed securities, and so on), by percentage allocation; the credit ratings of the fund's holdings, again by percentage allocation; and the average duration of the securities held by the fund.  *See, e.g.*, VerGow Decl. Ex. A, at 18-19.  These disclosed fund characteristics enabled plan fiduciaries and participants to evaluate whether they wanted an investment with more—or less—risk.  Giving plan participants control over how to allocate their accounts among various fund options is ERISA's very design for defined contribution plans. *See, e.g.*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 673 (7th Cir. 2011) (rejecting "paternalistic" oversight of participant choices).

The one aspect of Fidelity's disclosures with which Plaintiffs take issue is its use of the 3-Month T-Bill Index that Fidelity offered as a comparator beginning in 2011.  Compl. ¶¶ 3, 57, 60.[9]  What plaintiffs neglect to mention is the DOL's ***own model disclosure*** uses the 3-Month T-Bill index as the comparator for stable value funds.  *Supra* at 14.  There was nothing misleading about Fidelity's use of the benchmark identified by its regulator, neither was it misleading for Fidelity to use the functionally similar iMoneyNet First Tier Institutional Money Market Funds Average returns as a comparator in earlier fund fact sheets that predated DOL's guidance.  *See also* Stable Value Handbook 120 ("Money market rates are the stable value participants'

---

[9] The Complaint alleges that the fund fact sheets used the iMoneyNet First Tier Institutional Money Market Funds Average as a benchmark throughout the class period.  Compl. ¶ 56.  In fact, the fund fact sheets show that MIP began to use a 3-month T-Bill comparator in the fourth quarter of 2011, and that its returns looked much like the iMoneyNet returns.  *Compare, e.g.*, VerGow Decl. Ex. A, at 16 (third quarter 2011 fund fact sheet, showing historical performance of money market index comparator), *with id.* at 18 (fourth quarter 2011 fund fact sheet, showing historical performance of 3-month Treasury bill index comparator).  The similarity between the returns of the iMoney Net Index and T-Bill Index reflects their similar composition: money market funds are restricted by SEC Rule 2a-7 to portfolios consisting almost entirely of short-term, highly liquid securities with minimal credit risk, such as U.S. Treasury bills.  *See* 17 C.F.R. § 270.2a-7(c)(3); Money Market Fund Reform, 75 Fed. Reg. 10,060, 10,060-61 & n.8 (Mar. 4, 2010).

benchmark, since a money market fund is an investment alternative that also provides stability of principal."). Plaintiffs' conclusory allegation that Fidelity violated the DOL's disclosure regulation (Compl. ¶ 57) is thus miles off the mark. Indeed, use of the T-Bill and money market comparators further communicated the fund's conservative profile so that fiduciaries and participants could decide whether this was the right fund for them.

### D.   Plaintiffs' Wrap Fee Allegations Must Be Dismissed Because Plaintiffs Do Not And Cannot Allege That The Fees Exceeded Market Rates

Plaintiffs also allege that the increase in MIP's wrap fees from 8 basis points to 22 basis points between 2009 and 2011 demonstrates that the new fees were "excessive." Compl. ¶¶ 54, 95. Critically, plaintiffs do not allege that the new fees were above market. Nor could they: the documents they incorporate into the Complaint show MIP's fees were within *or below* market range at all times.[10]

It is not a breach of fiduciary duty to cause a fund to pay a service provider a market rate. *See Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337-CIV.-JORDAN, 2007 WL 2263892, at *47 (S.D. Fla. Aug. 7, 2007), as amended (Aug. 10, 2007) ("I cannot say that the Plan fiduciaries were imprudent … paying fees at the market rate."); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (explaining that where product was "offered to investors in the general public,"

---

[10] The September 2011 Stable Value Industry Association ("SVIA") report on which Plaintiffs rely shows that the entire market experienced fee increases to the range alleged by plaintiffs: "[F]ees associated with Synthetic GICs ranged from 4 to 8 basis points prior to the financial crisis…. [T]hese fees have recently increased to between 20 and 25 basis points because of limited capacity in the market." VerGow Decl. Ex. E, at 20 (incorporated by Compl. ¶ 72 n.11). And the fund fact sheets on which plaintiffs rely show that, as of the fourth quarter of 2011, MIP's weighted average wrap fee was still under 14 basis points, well below the market range reported by the SVIA. VerGow Decl. Ex. A, at 18. This same report also explains: "Limited capacity has led to changes in stable value contract terms … and ultimately higher fees." *Id.* One need not engage in rank speculation about motivation to "assuage the concerns" of wrap providers (Compl. ¶ 61) to understand that reduced product capacity typically leads to higher prices.

the price was "necessarily [] set against the backdrop of market competition"). Furthermore, a service provider's fee cannot be evaluated without reference to the nature of the services the plan is receiving for the price. *See, e.g.*, *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.) (holding that plaintiffs had not plausibly alleged that the fiduciaries agreed to pay excessive fees where they "fail[ed] to allege that the fees were excessive relative to the services rendered" (quotation omitted)). Plaintiffs do not even attempt to allege that the wrap coverage Fidelity negotiated was worth less than what MIP paid for it; indeed, plaintiffs altogether ignore that the creditworthiness of wrap providers varies in ways that legitimately affect price.

Accordingly, the Complaint does not state an ERISA claim through its bare allegation that MIP's wrap fees rose, or its conclusory assertion that the new fees were "excessive."

## II. PLAINTIFFS' EXCESSIVE FEE ALLEGATIONS MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT AND CANNOT ALLEGE THAT FIDELITY BREACHED ANY FIDUCIARY DUTY WITH RESPECT TO SETTING MIP'S FEES

Plaintiffs' excessive fee claim also fails as a matter of law. Plaintiffs complain that MIP's "expense ratio" is too high. Compl. ¶ 72. As the fund fact sheets cited in the Complaint make clear, this "expense ratio" is the sum of (1) the fees that MIP pays to the wrap providers, and (2) the 55 bps management fee that MIP pays to Fidelity. *See, e.g.*, VerGow Decl. Ex. A, at 18-49. As previously noted, Plaintiffs' challenge to the wrap fees fails as a matter of law. As explained below, Plaintiffs' challenge to Fidelity's management fee is equally flawed.

It is settled law that a service provider to an ERISA plan does not act as a fiduciary in negotiating the terms under which it will be retained, including its own compensation.[11] Even

---

[11] *See, e.g.*, *Renfro v. Unisys*, 671 F.3d 314, 324 (3d Cir. 2011) (a service provider is "not an ERISA fiduciary with respect to [establishing] the terms of the agreement for his

where a service provider has authority to unilaterally change its investment management fees after being engaged, it cannot be held liable for a fiduciary breach if it does not actually exercise that authority.  *See McCaffree*, 2016 WL 98332, at *4 (rejecting an excessive fee claim where plaintiff did not allege that the service provider ever exercised its authority to increase its fees); *Santomenno*, 768 F.3d at 296-97 (same).  This is especially true where, as here, the claims against Fidelity are solely in its role as an investment manager for one of many plan investment options, because plaintiffs do not and could not allege that an investment manager of a single investment option is engaged in "plan administration."  *Compare* 29 U.S.C. § 1002(21)(A)(i) (designating as an ERISA fiduciary anyone who "exercises" discretionary authority over plan management), *with* 29 U.S.C. § 1002(21)(A)(iii) (designating as an ERISA fiduciary anyone who "has" discretionary authority over plan administration); *see also Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, 961 F. Supp. 2d 393, 400-02 (D. Conn. 2013) (recognizing that 29 U.S.C. § 1002(21)(A)(i) and 29 U.S.C. § 1002(21)(A)(iii) "provide distinct avenues for acquiring fiduciary status," and that 29 U.S.C. § 1002(21)(A)(i) requires actual "exercise" of discretionary authority); Compl. ¶ 88 (citing and quoting only 29 U.S.C. § 1002(21)(A)(i)).

Plaintiffs have not alleged that Fidelity exercised any discretionary authority over its management fees during the class period.  Nor could they have made such an allegation:  the fund fact sheets cited in the Complaint show that Fidelity's 55 bps management fee was established before 2009, and has remained constant at 55 bps throughout the class period.

---

compensation"); *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) (same); *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co.*, 768 F.3d 284 (3d Cir. 2014) (same); *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, No. 15-1007, 2016 WL 98332, at *3-4 (Jan. 8, 8th Cir. 2016) (same).  Instead, fiduciary responsibility for ensuring the propriety of a service provider's fees rests with the plan's administrator, who is typically responsible for engaging service providers.  *Id*.

VerGow Decl. Ex. A.[12]  Moreover, any challenge to Fidelity's initial decision to set the 55bp fee

at which it would offer MIP to plans would fail because (1) Fidelity was not a fiduciary to any

plan before the plan retained it as investment manager, *see supra* note 11, and (2) such a

challenge would be barred by ERISA's six-year statute of repose.  *See infra*.[13]

III.   **PLAINTIFFS' CLAIM IS TIME BARRED TO THE EXTENT IT COMPLAINS ABOUT LINGERING EFFECTS OF ALLEGED CONDUCT OCCURRING MORE THAN SIX YEARS BEFORE SUIT**

Under ERISA's statute of repose, "no action may be commenced … with respect to a

fiduciary's breach of any responsibility … [more than] six years after (A) the date of the last

action which constituted a part of the breach or violation …."  29 U.S.C. § 1113(1).  This

provision precludes a challenge to the ***effects*** of an alleged breach when the breach itself

occurred more than six years before suit was filed.  *See, e.g.*, *Riley v. Metro Life Ins. Co.*, 744

F.3d 241, 248 (1st Cir. 2014); *Edes v. Verizon Commc'ns.*, 417 F.3d 133, 139 (1st Cir. 2005).

Key allegations in this Complaint improperly seek to recover for the lingering effects of

conduct alleged to have occurred before 2009.  For example, Plaintiffs expressly allege that

MIP's pre-2009 "investments declined in value when the financial crisis struck in 2008, causing

the MIP … ***to suffer damage beginning in 2009 and continuing for years afterwards*** (due to

the nature of the 'crediting rate' investment return mechanism of stable value funds like the MIP,

which amortizes investment losses over the duration of the portfolio)."  Compl. ¶ 43 (emphasis

---

[12] Although MIP's *expense ratio* has changed over time, *see* Compl. ¶¶ 72, 74, those changes reflect fluctuation in the fees that MIP paid to its wrap providers.

[13] Plaintiffs also do not plausibly allege that Fidelity's fees are excessive; as might be expected in a competitive marketplace, they are not.  Plaintiffs misleadingly compare MIP's expense ratio ***gross of all expenses*** (including wrap fees) to survey data that includes funds that report their expense ratios net of certain expenses, or earn their compensation principally through spread and thus have inapposite fee structures.  *See* VerGow Decl. Ex. F, at 11 (incorporated by Compl. ¶ 72); *id.* Ex. G, at 24 (incorporated by Compl. ¶ 72 n.11).  For the reasons stated in the text, the Court need not reach this point.

added).  Plaintiffs also allege that, "[b]ecause of the[] losses caused by Fidelity's imprudent [pre-crisis] investment strategy, Fidelity faced increasing pressure from the Wrap Providers after 2008 to make changes to the underlying MIP investment portfolio and to make modifications to the existing wrap contracts for the MIP."  Compl. ¶ 45.  In other words, plaintiffs allege that Fidelity's pre-2009 conduct caused the wrap providers to be unwilling to offer new contracts absent a commitment by Fidelity to adhere to a conservative investment mandate.  But the statute of repose takes the parties where they are on the day the repose period starts, and does not permit a defendant to be penalized for pre-repose period conduct even if that conduct continues to have an impact during the repose period.  Allegations challenging the effects of actions taken before 2009 are time-barred.

## **CONCLUSION**

The Complaint should be dismissed with prejudice.

Dated: January 20, 2016                        Respectfully submitted,

                                               FIDELITY MANAGEMENT TRUST
                                               COMPANY

                                               By its attorneys,

                                               */s/ Gregory F. Jacob*
                                               Brian D. Boyle (*pro hac vice*)
                                               Gregory F. Jacob (*pro hac vice*)
                                               Meaghan VerGow (*pro hac vice*)
                                               O'Melveny & Myers LLP
                                               1625 Eye Street, N.W.
                                               Washington, D.C. 20006
                                               Tel.: (202) 383-5300
                                               bboyle@omm.com
                                               gjacob@omm.com
                                               mvergow@omm.com

John J. Falvey, Jr. (BBO# 542674)
Alison V. Douglass (BBO# 646861)
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA 02109
Tel: (617) 570-1000
jfalvey@goodwinprocter.com
adouglass@goodwinprocter.com

## CERTIFICATE OF SERVICE

I, Gregory F. Jacob, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 20, 2016.

*/s/ Gregory F. Jacob*
Gregory F. Jacob
