**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JAMES ELLIS and WILLIAM PERRY <br><br> Plaintiffs, <br><br> v. <br><br> FIDELITY MANAGEMENT TRUST COMPANY, <br><br> Defendant. | Case No. 1:15-cv-14128-WGY <br><br> **ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS THE COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................. 1

II.    SUMMARY OF ALLEGATIONS IN THE COMPLAINT ................................... 2

    A.  Stable Value Funds ...................................................................................... 2

    B.  The MIP ....................................................................................................... 3

    C.  The Subpar Performance of the MIP ........................................................... 5

    D.  The Excessive Fees of the MIP .................................................................... 6

III.   ARGUMENT ....................................................................................................... 6

    A.  Standard on a Motion to Dismiss ................................................................. 6

    B.  The Complaint When Viewed as a Whole Alleges Far More Than a "Mere Hindsight Criticism" of the MIP's Performance ............................................ 7

    C.  Plaintiffs Have Alleged a Flawed Investment Process .................................. 8

    D.  The Fact that the Return on the MIP Failed to Outpace Inflation and Substantially Underperformed Benchmarks Supports the Inference That Fidelity Breached Its Fiduciary Duties Under ERISA ............................................................... 10

    E.  Fidelity's Purported Justifications for its Investment Strategy Cannot be Adjudicated on a Motion to Dismiss ......................................................................................... 15

    F.  There is No Basis for Dismissing the Allegations Relating to Wrap Fees ....... 17

    G.  The MIP Charged Excessive Fees ............................................................... 18

    H.  ERISA's Statute of Repose Does Not Bar Plaintiffs' Claim. .......................... 20

IV.   CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Lockheed Martin Corp.*
   725 F.3d 803 (7th Cir. 2013)..................................................................... 11, 13, 14

*Abbott v. Lockheed Martin Corp.*
   No. 06-cv-0701, 2009 WL 839099 (S.D. Ill. Mar. 31, 2009) ................................. 1, 11, 12, 13

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ............................................................................... 7

*Braden v. Wal-Mart Stores, Inc.*
   588 F.3d 585 (8th Cir. 2009)..................................................... 7, 10, 15, 18

*California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*
   259 F.3d 1036 (9th Cir. 2001).................................................................... 9

*Charters v. John Hancock Life Ins. Co.*
   583 F. Supp. 2d 189 (D. Mass. 2008) ........................................................ 19

*Concha v. London*
   62 F.3d 1493 (9th Cir. 1995).................................................................... 7

*Donovan v. Bierwith*
   754 F.2d 1049 (2d Cir. 1985) ................................................................. 12

*Fudge v. Penthouse Intern., Ltd.*
   840 F.2d 1012 (1st Cir. 1988) ................................................................. 17

*Garcia-Catalan v. U.S.*
   734 F.3d 100 (1st Cir. 2013) .................................................................... 7

*In re Unisys Savings Plan Litigation*
   74 F.3d 420 (3d Cir. 1996)....................................................................... 8

*Krueger v. Ameriprise Financial, Inc.*
   No. 11-cv-02781, 2012 WL 5873825 (D. Minn. Nov. 20, 2012) .............................. 8

*McCaffree Financial Corp. v. Principal Life Ins. Co.*
   __ F.3d __, 2016 WL 98332 (Jan. 8, 2016) ............................................... 19

*Pension Benefit Guarantee Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan
   v. Morgan Stanley Investment Mgmt. Inc.*
   712 F.3d6 705 (2d Cir. 2013)............................................................... 9, 10

*Santomenno v. Transamerica Life Ins. Co.*
   No. CV 12-02782 DDP, 2013 WL 603901 (C.D. Cal. Feb. 19, 2013) ...................... 19

*Tibble v. Edison Intern.*
  __ U.S. __, 135 S. Ct. 1823 (2015) ................................................................. 14, 20

*Tussey v. ABB, Inc.*
  746 F.3d 327 (8th Cir. 2014) ..................................................................... 18

**Statutes**

29 C.F.R. § 2550.404a-1 ............................................................................ 8

29 C.F.R. §2550.404a-5 ............................................................................ 16

29 C.F.R. § 2550.404c-1 ......................................................................... 2, 11

29 U.S.C. § 1104 .................................................................................. 9

**Rules**

Fed. R. Civ. Proc. 8(a)(2) ......................................................................... 6

Fed. R. Civ. Proc. 15(a)(2)………………………………………………………….20

## I.    INTRODUCTION

Plaintiffs' Complaint pleads in detail that Defendant Fidelity Management Trust Company ("Fidelity") breached its fiduciary duties under ERISA.  Plaintiffs allege that Fidelity's investment of Plaintiffs' retirement funds in the Fidelity Group Employee Benefit Plan Managed Income Portfolio Commingled Pool ("MIP"): (1) failed to meet the basic objectives of retirement investments generally and stable value funds specifically; (2) performed far worse than its peers; and (3) charged excessive fees. Fidelity's management and supervision of the MIP was therefore imprudent under ERISA. *See Abbott v. Lockheed Martin Corp.*, No. 06-cv-0701, 2009 WL 839099, at *9-10 (S.D. Ill. Mar. 31, 2009) (denying defendant summary judgment on claim that defendants' investment in stable value fund was imprudent because, among other things, "the SVF's return was so poor that it did not beat inflation by a sufficient margin to provide a meaningful retirement asset").

At this early stage in the litigation and without the benefit of formal discovery, Plaintiffs have alleged specific and plausible claims for breach of fiduciary duty by Fidelity. Plaintiffs have also alleged the circumstances that caused Fidelity to adopt an excessively-conservative investment strategy coupled with excessive fees for the benefit of Fidelity and the wrap providers and at the expense of retirement investors such as Plaintiffs. Plaintiffs have also identified standards against which to measure the subpar performance and excessive fees of the MIP, including industry standards and data about the performance and fees of comparable funds.

Fidelity's motion to dismiss the Complaint depends on: (1) mischaracterizing, fragmenting, or ignoring critical allegations in the Complaint; (2) asking this Court to draw inferences from Plaintiffs' allegations in the Complaint favorable to Fidelity; and (3) selectively interpreting the documents purportedly incorporated into the Complaint – and again asking this

Court to draw inferences in Fidelity's favor based on these documents. Of course, none of these tactics are permitted at the motion to dismiss stage. Indeed, both Fidelity's disagreements with Plaintiffs' allegations and the alternate theories and factual materials Fidelity submits to this Court in connection with its motion underscore that resolution of Plaintiffs' claims requires fact-intensive determinations that can only be resolved after discovery. Accordingly, Fidelity's motion to dismiss should be denied.

## II.      SUMMARY OF ALLEGATIONS IN THE COMPLAINT

### A.      STABLE VALUE FUNDS

A stable value fund is a retirement savings vehicle well defined by industry practice and ERISA regulations. According to the trade association for the stable value industry, the Stable Value Investment Association ("SVIA"), a stable value fund should be invested in a "high-quality, diversified, fixed-income portfolio" that is "designed to preserve capital while providing *steady positive returns*." Compl. ¶ 18, *quoting* SVIA, "Stable Value FAQ" (emphasis added). Under the implementing regulations for the Employee Retirement Income Security Act of 1974 ("ERISA"), to be afforded a "safe harbor" under Section 404(c) of ERISA, employers offering defined contribution retirement plans are required to provide at least three options for investment, each with "materially different risk and return characteristics." 29 C.F.R. § 2550.404c-1. One of these investment options must be a so-called "safe" option: an "*income producing*, low risk, liquid fund, subfund, or account." *Id.*(emphasis added). Stable value funds are a popular investment option offered in defined contribution retirement plans (colloquially known as 401(k) plans) to satisfy this requirement. Compl. ¶ 20. Over seven hundred billion dollars in plan assets are invested in stable value funds and such funds are offered in nearly two-thirds of all 401(k) plans. *Id.* ¶ 21.

Two closely-related features of stable value funds are especially important. First, because retirement investors tend to be intermediate-term investors with limited and predictable liquidity needs, stable value funds can take advantage of the "yield curve." Other things being equal, longer term investments will offer higher yields than shorter term investments. Thus, by design, returns of stable value funds should be substantially higher than investments with shorter durations, such as money market funds. Compl. ¶ 28 ("returns substantially higher than a money market fund are an essential characteristic of stable value funds"). *See also* Compl. ¶ 26 ("'earning a fairly stable return which exceeds that of shorter maturity alternatives'" is an important objective of stable value funds), *quoting* Frank J. Fabozzi, *the Handbook of Stable Value Investments* (1998), p. 83. Longer duration investments, however, tend to have higher levels of volatility.

The second critical feature of stable value funds is wrap insurance which minimizes and "smooths" the excess volatility associated with the longer duration stable value fund investments. Compl. ¶ 30.   The wrap insurance also: (1) protects principal and accumulated returns; and (2) provides liquidity by allowing participants to transact with the stable value fund at book value rather than market value. *Id*. ¶¶ 29-35. The wrap insurance generally provides a risk "floor" that both protects principal and accumulated returns and ensures liquidity, allowing stable value fund managers to focus on obtaining the highest possible returns consistent with the other goals of stable value investing. *Id*. ¶ 35. Because the wrap insurers are at financial risk with respect to the stable value fund investments, they can (and in this case did) impose pressure on Fidelity's stable value fund managers to reduce risk at the expense of return to investors. *Id*. ¶ 34.

**B.    THE MIP**

The MIP purports to be a typical stable value fund. According to Fidelity, the MIP "[s]eeks to preserve your principal investment while earning interest income." Ex. "A" to

Motion, at p.2. The MIP is and was during the relevant times offered as an investment option in 401(k) plans for Plaintiffs and members of the putative class. Compl. ¶ 10. Fidelity is the trustee of the MIP and, as such, has primary responsibility for both the administration of the MIP and the prudent investment of the MIP's assets. *Id.*¶ 14. Fidelity delegated day-to-day management of the MIP to its affiliate, Fidelity Management and Research Company ("Fidelity MRC"), but as the trustee Fidelity retained the continuing duty to supervise and monitor the MIP. *Id.* ¶ 15. As of October 1, 2009, the MIP held nearly $9.4 billion in assets but that amount had been reduced to $6.3 billion as of September 30, 2014, in large part due to the mismanagement alleged in the Complaint. *Id.* ¶ 36.

Before the period directly at issue in this action, Fidelity engaged in an imprudent and ultimately unsuccessful investment strategy by, among other things, causing large amounts of the MIP's assets to be held in various forms of securitized debt. Compl. ¶ 42. This caused large losses to the MIP, including a market value loss of $381 million in 2008. *Id.* ¶ 43.

As a result of these losses, Fidelity faced potential liability to its wrap providers. The wrap providers pressured Fidelity to significantly modify the asset allocation of the MIP, reducing the risk to the wrap providers and thereby reducing returns to participants. Compl. ¶ 46. As described below, despite the lower risk profile caused by asset reallocation, Fidelity paid the wrap providers *higher* fees to offset the risk of loss to which the wrap providers were exposed as a result of Fidelity's past aggressive investment strategy.

Fidelity's asset allocation modifications had two primary effects. First, the average duration of the investments in the MIP fell to 2.2 years in 2009 and 2.3 years in 2010, at the very bottom of the range of typical stable value fund investments. *Id.*¶ 50.

Second, Fidelity dramatically increased the MIP's allocation to U.S. Treasury bonds. The percentage of the MIP's investments in Treasuries was only 12.7 percent as of September 30, 2007 but increased to 43.7 percent as of September 30, 2011 and 46 percent as of September 30, 2012. Compl. ¶ 51. This large allocation to Treasuries was highly anomalous by industry standards. According to a survey of SVIA members, the average participating "pooled" stable value fund invested only about 22 percent of assets in such securities in 2011 and 25 percent of assets in such securities in 2012. *Id.* This allocation to Treasuries depressed returns, as Treasuries are risk free and accordingly have low returns compared to other types of bonds. *Id.*

### C.   THE SUBPAR PERFORMANCE OF THE MIP

For three of the four years from 2010 through 2013, the MIP's return, known as the "crediting rate," did not even exceed the inflation rate. Compl. ¶ 62. Over that four year period, on a cumulative basis, the MIP returned a crediting rate of 6 percent as compared to an inflation rate of 10.2 percent. This was a direct result of Fidelity pursuing an investment designed to reduce risk to the wrap providers rather than an investment strategy consistent with the goals of a stable value fund.

The MIP performed even worse when considering industry standard benchmarks. Comparing the performance of the MIP with the Hueler Companies' Stable Value Indices, a stable value industry benchmark that aggregates the performance of over a dozen leading stable value funds, shows that the MIP consistently provided a substantially lower crediting rate than similar funds during this time period. Compl. ¶ 63.  And compared to the MIP's stated (until 2012) benchmark, the Barclays U.S. 1-5 Government / Credit Bond Index, from 2009 through 2013, the MIP provided a cumulative return of 6.8 percent compared to 18.4 percent for the benchmark. Compl. ¶ 64.

This underperformance was not caused by prevailing market conditions or the desire to preserve principal. Competing stable value funds – which faced the exact same market conditions and had the same goal of preserving principal – performed much better than the MIP. Compl. ¶ 68. The consistent underperformance of the MIP during this period of time is especially striking because academic research has found that returns from individual stable value funds have historically occurred in a relatively narrow band. Compl. ¶ 69.

### D.   THE EXCESSIVE FEES OF THE MIP

Although Fidelity's asset reallocation reduced the investment risks in the MIP for the benefit of the wrap providers, Fidelity also paradoxically increased the fees paid to those same wrap providers despite the reduced risk. From 2009 through 2011, the fees paid to wrap providers increased from 8 basis points to 22 basis points or more, an increase taken directly from the returns available to investors. Compl. ¶ 54.

Fidelity also charged excessive fees in other ways. The expense ratio for the MIP in 2012 was .69 percent (or 69 basis points) and has increased to 79 basis points as of 2015. Compl. ¶¶ 72 & 74. According to the SVIA, however, stable value funds had an average expense ratio of 41 basis points in 2012. *Id.* In light of the fact that its fees exceeded industry norms, Fidelity began to offer a second share class for the MIP with a fee 20 basis points less than the fees charged by Class 1 shares, even though there was otherwise no difference between the two purported classes. *Id.* ¶ 73. The cheaper share class (Class 2) was not, however, made available to all ERISA plans investing in the MIP. *Id.*

## III.   ARGUMENT

### A.   STANDARD ON A MOTION TO DISMISS

To state a valid claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). To meet this standard,

"a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). A plausible claim "does not require detailed factual allegations, but does demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quotation omitted). A claim meets this test "when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In deciding a motion to dismiss, a court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." *Garcia-Catalan v. U.S.*, 734 F.3d 100, 102 (1st Cir. 2013). And in cases alleging breach of fiduciary duty under ERISA, "the circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage" because "[w]here a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that the control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a position to describe with particularity the events constituting the alleged misconduct." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995).

### B. THE COMPLAINT WHEN VIEWED AS A WHOLE ALLEGES FAR MORE THAN A "MERE HINDSIGHT CRITICISM" OF THE MIP'S PERFORMANCE

Fidelity attacks various aspects of Plaintiffs' claims in isolation but fails to consider the Complaint *as a whole*. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (on a motion to dismiss, the complaint must be viewed "as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible"). Viewing the Complaint as a whole is particularly important here because it is not just one aspect of Fidelity's investment and fee practices that is flawed: rather, it is the *combination* of Fidelity's conservative investment

decisions and increased fees *within the context* of industry standards for stable value funds that renders Fidelity's conduct imprudent and otherwise in violation of ERISA.[1]

The Complaint alleges that the MIP was an imprudent investment vehicle. The reason it was an imprudent investment vehicle was not due to market conditions.  Rather, it was due to a flawed *design*. Fidelity reduced principal risk and returns by investing in an excessively conservative manner while simultaneously paying increased – and excessive – fees to itself and the wrap providers. Accordingly, the allegations in the Complaint do not rely on hindsight. The allegations are not predicated merely on the fact that the MIP happened to return less than inflation or perform worse than comparable stable value funds. Rather, the Complaint cites specific *reasons* for such poor performance, as explained further below. *See Krueger v. Ameriprise Financial, Inc.*, No. 11-cv-02781, 2012 WL 5873825, at *10-11 (D. Minn. Nov. 20, 2012) ("A claim may be based on poor performance compared to other funds, but only when supported by additional facts.").

## C.    PLAINTIFFS HAVE ALLEGED A FLAWED INVESTMENT PROCESS

Contrary to Fidelity's argument, Plaintiffs have alleged that the poor investment returns in the MIP were a direct result of a flawed and conflicted process that enriched Fidelity and the wrap providers at the expense of investor returns. In the aftermath of an excessively risky investment strategy that yielded significant losses, Fidelity adopted an excessively conservative investment strategy under pressure from its wrap providers while at the same time paying higher

---

[1] A fiduciary's investment decisions must be prudent not in the abstract but with reference to the *specific goals* of a particular type of investment. A fiduciary must consider "the role the investment … plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(i). In other words, a fiduciary's investment decisions are evaluated under ERISA "in light of the *character and aims* of the particular type of plan he serves." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Cir. 1996) (emphasis added and quotation omitted). Here, this means Fidelity's conduct must be measured with reference to the specific goals and norms of stable value fund investing.

fees to itself and the wrap providers. Fidelity's goal was to reduce its potential liability to these wrap providers related to Fidelity's conduct in earlier years. Compl. ¶¶ 43-46. This was contrary to ERISA's mandate that all investment decisions made by a fiduciary be solely for the best interests of participants and beneficiaries. 29 U.S.C. § 1104(a)(1).

Furthermore, it required no investigation to understand that a relatively low duration and relatively high allocation to Treasuries would depress yields. The fact that low yields would be an outcome of this strategy follows from fundamentals of finance theory and was obvious at the relevant times. *See Pension Benefit Guarantee Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Investment Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) ("*St. Vincent*") ("We judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight.") A purportedly adequate investigation is not a defense to an ERISA prudence claim where the challenged conduct is based on a mismatch between a particular investment and the overall needs of the portfolio rather than an allegedly negligent failure to appreciate risks. *See California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1044-45 (9th Cir. 2001) (finding breach of ERISA's duty of prudence by causing conservative fund to invest in a large amount of risky "inverse floaters" despite also finding that the fiduciary complied with industry standards in its investigation of the investment).

Fidelity relies heavily on *St. Vincent*, yet nothing in *St. Vincent* requires any greater particularity in pleading than Plaintiffs have provided here. The plaintiff in *St. Vincent* was the fiduciary plan administrator and was thus, according to the court, "in a position to plead its claims with greater factual detail than is typically accessible to plaintiffs prior to discovery." *Id.* at 709. Plaintiffs, by contrast, are plan participants with limited information about the MIP.

9

Further, *St. Vincent* was based on the claim that the defendant invested a large portion of the portfolio's assets in mortgage-backed securities despite purported "warning signs" known throughout the investment industry that such securities in general entailed substantial risks. The court reasoned that the plaintiffs there failed to allege "facts supporting the plausible inference that defendant-appellee knew, or should have known, that the particular mortgage-backed securities in the relevant portfolio were imprudent investments." *St. Vincent*, 712 F.3d at 723. The allegations in *St. Vincent* were so broad, generalized, and unconnected to any specific facts about the defendant in that case that, if allowed, they would have supported breach of fiduciary duty claims against practically *every* ERISA fiduciary that invested in and held non-agency mortgage-backed securities during the financial crisis. Here, Plaintiffs do not allege a "hindsight" theory that Fidelity disregarded generalized "warning signs" about a particular broad category of investment; rather Plaintiffs allege that Fidelity made a *knowing* and *deliberate* decision to adopt an unduly conservative investment strategy designed to enrich itself and the wrap providers through increases in fees during a time when Fidelity had reallocated the MIP to a highly conservative investment profile – all as a scheme to address wrap provider potential claims against Fidelity related to investment decisions made by Fidelity in earlier time periods. Compl. ¶¶ 43-48, 54-55.

D.    **THE FACT THAT THE RETURN ON THE MIP FAILED TO OUTPACE INFLATION AND SUBSTANTIALLY UNDERPERFORMED BENCHMARKS SUPPORTS THE INFERENCE THAT FIDELITY BREACHED ITS FIDUCIARY DUTIES UNDER ERISA**

As the Eighth Circuit held in *Braden*, "[i]t is reasonable … to infer" from allegations that investment assets were invested in poorly performing vehicles with high fees "that the process was flawed" even in the absence of direct allegations about that process. *Braden*, 588 F.3d at 596. As set forth above, Plaintiffs have made direct allegations about Fidelity's flawed and

conflicted process. The other facts alleged in the Complaint, however, make drawing an inference of imprudence from poor performance here more than plausible.

During the four year period between 2010 and 2013, on a cumulative basis, the MIP returned a crediting rate of 6 percent while inflation increased 10.2 percent. The comparison to inflation is significant because one of the fundamental purposes of a stable value fund is to generate income. Compl. ¶ 18 (according to the SVIA, a stable value fund is designed to, among other things, provide "steady positive returns"); 29 C.F.R. § 2550.404c-1 (the "safe" option required to be offered in a 401k plan protected by the "safe harbor" must be an "income producing" fund). A fund that over a period of several years returns substantially less than inflation is not a useful retirement asset in any sense and does not provide any real positive return or income because it has a *negative* return when adjusted for inflation. This is especially true because there are alternative investment vehicles, such as Treasury Inflation Protected Securities, that offer a risk-free long-term investment that will, *at a minimum*, outpace inflation.

 Accordingly, the district court in *Abbott* affirmed that failure of a stable value fund to outpace inflation can be a predicate for ERISA breach of fiduciary duty claims. In denying defendants' motion for summary judgment, the court summarized the claim as follows:

> Plaintiffs submit that the SVF was imprudent because it should have had no more than 5% of its assets invested in money market funds instead of the 50% to 99% that was actually invested. According to Plaintiffs, the SVF's return was *so poor that it did not beat inflation by a sufficient margin to provide a meaningful retirement asset.* Plaintiffs contend that, although the SVF was low-risk and did not lose its value, *mere preservation of principal was not the Fund's sole objective.*

*Abbott,* 2009 WL 839099, at *9 (emphasis added). *See also Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 810 (7th Cir. 2013) (reversing denial of class certification of this same claim, which the court described as based on the allegation that the stable value fund's "mix of

investments was not structured to allow the fund to beat inflation and therefore that it could not serve as a prudent retirement investment for Lockheed employees").

To be sure, the facts of *Abbott* are different and more detailed than those here, in part because *Abbott* was decided on a complete factual record at the summary judgment stage rather than at the motion to dismiss stage. The difference between *Abbott* and this case, however, is one of *degree* rather than of *kind*. Like the plaintiffs in *Abbott*, Plaintiffs here allege that the mix of investments in the MIP, combined with the high fees – and indeed fee increases – charged in connection with that fund, caused a return "so poor that it did not beat inflation by a sufficient margin to provide a meaningful retirement asset."

More fundamentally, *Abbott* refutes the central premise of Fidelity's motion: that it is impossible as a matter of law to challenge management of a stable value fund for being too conservative. As *Abbott* demonstrates, a claim for breach of fiduciary duty in connection with a stable value fund is viable even if the fund preserves principal and has a minimally positive return. This is because the measure of loss in an ERISA case is not simply out of pocket loss (*i.e.* loss of principal); rather it is the difference between what the investment returned compared to what the investment would have returned had it been managed prudently. *See Donovan v. Bierwith*, 754 F.2d 1049, 1056 (2d Cir. 1985). Like the plaintiffs in *Abbott* and consistent with *Donovan,* Plaintiffs here properly focus on the appropriate return for a prudently-managed stable value fund rather than merely the preservation of principal.

Relatedly, there is nothing inconsistent between the theory alleged here and the theory alleged in the *Whitley* case. The fact that one stable value fund was managed in too aggressive a manner in no way precludes the possibility that a wholly different stable value fund was managed in too conservative a manner. As explained above and in the Complaint, the stable

12

value fund is a "hybrid" vehicle designed to offer higher returns than a lower-risk alternative such as a money market fund while at the same time entailing less risk than a stock fund or an unwrapped bond fund. *See also* Compl. ¶¶ 58-59 and accompanying tables (showing that stable value funds have higher returns than money market funds and lower volatility than bond funds). Given this fundamental feature of stable value funds, it is eminently possible for a particular stable value fund to be managed in an imprudently risky way while a different stable value fund is managed in an imprudently conservative way. The central question is whether the particular stable value fund was managed consistent with the purpose and nature of stable value funds.

The comparison of the MIP's returns against the Hueler average is similarly probative of Fidelity's lack of prudence. Compl. ¶ 63 and accompanying table. Certain definitional features of stable value funds (*i.e.* insurance of principal and accumulated returns, return smoothing, and benefit responsiveness) impose a risk "floor" on the performance of stable value funds and, for this reason, the performance of stable value funds tends to fall within a fairly narrow band when compared to one another. Compl. ¶¶ 68-69. Furthermore, all stable value funds pursue the same basic "safe" strategy where the broad parameters of this strategy are set by investment guidelines imposed by wrap providers common throughout the industry. Compl. ¶ 68. Thus, comparing the performance of stable value funds against each other is telling, as they: (1) share the same basic objectives; (2) are subject to similar investment guidelines; (3) are insured in the same way; and (4) face the same market conditions.

The Hueler average is a meaningful and judicially-sanctioned benchmark for stable value fund performance. The Seventh Circuit in *Abbott* approved certification of a class of stable value fund investors defined as those whose stable value investment returns were less than the Hueler

average. *Abbott,* 725 F.3d at 810 (7th Cir. 2013). And this class definition was used as the basis of the $62 million *Abbott* settlement, sixty-three percent of which is for that stable value class.

To be sure, the fact that a particular stable value fund performed worse than the Hueler average does not necessarily mean it was managed imprudently. The fact that the MIP *consistently* and *substantially* underperformed the Hueler average, however, is sufficient to raise a rational inference of imprudence at the motion to dismiss stage when combined with the other facts set forth above. This is especially true because underperformance as measured by Hueler has formed the basis of other preliminary determinations, such as class certification and settlement in *Abbott.*

The comparison of the MIP's return to what Fidelity admitted was an appropriate benchmark for the MIP is also probative of Fidelity's lack of prudence. Prior to 2012, Fidelity represented that "[t]o measure how the [MIP] stacked up against other conservative investment options, you can compare its return to the Barclays Capital U.S. 1-5 Government / Credit Bond A+ Index …." Compl. ¶ 65, *quoting* 2008 MIP annual report. On a cumulative basis from 2009 through 2013, the MIP yielded 6.8 percent while this benchmark yielded 18.4 percent. Compl. ¶ 64. Fidelity began to omit this benchmark in 2012, presumably because the comparison was so unfavorable to the MIP. Compl. ¶ 65.

Finally, and at a minimum, the fact that the subpar performance of the MIP continued for several years should have caused Fidelity to take corrective action pursuant to its continuing duty under ERISA to monitor the prudence of investments and remove imprudent ones. *See Tibble v. Edison Intern.*, __ U.S. __, 135 S. Ct. 1823, 1829 (2015).

E.    **FIDELITY'S PURPORTED JUSTIFICATIONS FOR ITS INVESTMENT STRATEGY CANNOT BE ADJUDICATED ON A MOTION TO DISMISS**

In its Motion, Fidelity offers various alternate theories to explain its admittedly conservative investment strategy, such as the desire to preserve principal in the unlikely event of a wrap provider default. In so doing, Fidelity purports to rely on the provisions of its wrap contracts with insurers, among other extraneous facts not found in the Complaint. *See, e.g.,* Motion, p. 11 (asserting that its "wrap contracts do not provide airtight protection for the investors book value," and further claiming that "wrap contracts do not guarantee capital preservation for certain types of plan withdrawals," and that "wrap contracts usually do not cover defaulted securities").

Even considering these facts that are not properly before the Court, as the Eighth Circuit held in *Braden*, where "there may well be lawful reasons [defendants] chose the challenged investment options," it is not "[plaintiff's] responsibility to rebut these possibilities in his complaint" for purposes of evaluating a motion to dismiss. 588 F.3d at 596. The evidence at trial may show that Fidelity actually did adopt a conservative investment strategy for the benefit of the MIP's investors. That fact however cannot be assumed for purposes of this motion, especially in light of Plaintiffs' allegations that Fidelity was in fact motivated by self-interest which caused it to breach fiduciary duties owed to Plaintiffs.

Relatedly, Fidelity makes an *ipse dixit* claim that its conservative investment strategy was purportedly "fully disclosed." Fidelity does not, however, cite to any allegation in the Complaint or any evidence from the documents, purportedly incorporated by reference in the Complaint, that Fidelity ever "fully disclosed" that it had adopted an investment strategy that was substantially more conservative and thus likely to lead to lower returns than other stable value funds. While the fact sheets for the MIP (attached as Ex. "A" to the Motion) show the average

15

duration and the allocation of the MIP's investments, Fidelity provided no information that would allow participants or plan sponsors to put that information into context and thus "fully disclose" that its strategy was fundamentally different from other stable value funds.

To the contrary, by using money market benchmarks, Fidelity's disclosures were materially misleading in that Fidelity made it appear that the MIP was outperforming comparable conservative investment vehicles. Even worse, as Fidelity ignores, it had previously used a *different* benchmark, the Barclays 1-5 Government / Credit Index, and admitted that this benchmark could be used "[t]o measure how the [MIP] stacked up against other conservative investment options" but abandoned that benchmark when it began to reveal the poor performance of the MIP. Compl. ¶ 65, *quoting* 2008 MIP annual report.

Fidelity's assertion that the U.S. Department of Labor ("DOL") selected the 3-month treasury index as the "model benchmark" for stable value funds is inaccurate. The DOL's regulation governing disclosure of "benchmarks" makes no reference to the 3-month treasury index as a selected "model benchmark" or otherwise. 29 C.F.R. § 2550404a-5(d)(1)(iii) (2015). While the cited regulation contains a "Model Comparative Chart" to be used for *formatting* disclosures to plan participants, it does not reflect the DOL's formal approval of the benchmarks listed in the chart.[2]

Thus, Fidelity's citation to this chart falls far short of establishing that that the DOL has explicitly approved the use of that or a similar benchmark for stable value funds, that a 3-month

---

[2] Indeed, neither the proposed regulation nor the final rule discussion or commentary in the rulemaking process pertaining to DOL regulation § 2550.404a-5 reflect *any* discussion of the propriety of *any* particular benchmark for any fund or group of funds. *See generally* Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 73 Fed. Reg. 43014-01 (proposed July 23, 2008) (to be codified at 29 C.F.R. §2550.404a-5); Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 Fed. Reg. 64910-01 (Oct. 20, 2010) (to be codified at 29 C.F.R. §2550.404a-5).

T-Bill index is an appropriate benchmark for the MIP, that the use of such benchmark provided any meaningful disclosure by Fidelity to plan participants regarding the unusually conservative nature of the MIP, or that the DOL intended stable value funds to be managed as conservatively as a fund containing solely 3-month T-Bills. Nor does this explain why Fidelity abandoned the Barclays 1-5 Government / Credit Index comparison in its disclosures. A far more meaningful inquiry would be to examine the benchmarks specified by the wrap providers in the operative wrap contracts; an examination Plaintiffs hope to undertake through the discovery process.

### F. THERE IS NO BASIS FOR DISMISSING THE ALLEGATIONS RELATING TO WRAP FEES

On the basis of statements from documents purportedly incorporated into the Complaint, Fidelity asks this Court to conclusively rule that the wrap fees agreed to by Fidelity did not exceed the "market rate" and therefore cannot be challenged under ERISA. This is both procedurally and substantively improper.

First, the fact that the SVIA made certain observations about the wrap market in a document referenced in the Complaint for a completely different purpose does not conclusively establish that these facts are true. *See Fudge v. Penthouse Intern., Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988) ("Clearly, not every document referred to in a complaint may be considered incorporated by reference and thus introduced by the moving party in support of a motion to dismiss."). The SVIA document in question was used to provide reference data about typical fees charged by stable value funds and is in no way "absolutely central" to the complaint, *id.*, as a contract or securities prospectus, for example, may be.

Second, the fact that the wrap fees to which Fidelity agreed were no greater than the alleged "market rate" has little or no relevance under the facts of this case. The gravamen of Plaintiffs' complaint about the wrap fees is that Fidelity simultaneously (1) reduced the risk to

the wrap providers for which these fees were charged; but (2) paradoxically allowed the wrap providers increased fees. Compl. ¶ 54. This makes little sense. A lower-than-average level of risk would seem to mandate a lower-than-average wrap fee. This circumstance suggests that the increase in wrap fees was effectively a retroactive amendment to the contracts as a payoff to the wrap providers for having been exposed by Fidelity's investment practices to a greater level of risk than they originally anticipated. At a minimum, the anomalous result begs for a deeper examination of the background and reasons for the fee increases and demonstrating that a determination of the reasonableness of the fees, considering both prevailing market rates and the specific circumstances of this case, is not an issue that can be resolved on a motion to dismiss.

### G. THE MIP CHARGED EXCESSIVE FEES

The Complaint alleges that the expense ratio for the MIP was .69 percent (or 69 basis points) in 2012 and increased to 79 basis points for 2015. Compl. ¶¶ 72 & 74. By comparison, according to the SVIA, stable value funds had an average expense ratio of 41 basis points in 2012. Compl. ¶ 72. As the Complaint alleges, as Trustee of the MIP, Fidelity had discretionary responsibility and control over the administration of the MIP. Compl. ¶ 14. And Fidelity exercised that responsibility and control to offer a second share class of the MIP with reduced fees – which was not offered to all MIP investors – that had the same "investment objective, strategy, and risk" as the MIP first share class. Compl. ¶ 73 & n. 12. Thus, Fidelity's assertion that "Plaintiffs have not alleged that Fidelity exercised any discretionary authority over its management fees" (Motion, p. 18) is incorrect.

An ERISA fiduciary breaches its fiduciary duties by charging or causing to be charged excess fees. *See, e.g., Braden*, 588 F.3d at 595-96 (an ERISA fiduciary breaches its duties by offering participants investment options with excessive fees compared to readily-available alternatives); *Tussey v. ABB, Inc.*, 746 F.3d 327, 335-36 (8th Cir. 2014) (ERISA fiduciary

breached its duties by causing participants to pay excessive record-keeping fees);[3] *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 197 (D. Mass. 2008) (John Hancock could be liable for excessive "administrative maintenance" fees charged in connection with investment options offered in ERISA plans); *Santomenno v. Transamerica Life Ins. Co.,* No. CV 12-02782 DDP, 2013 WL 603901, at *6 (C.D. Cal. Feb. 19, 2013) ("TLIC is entitled to reasonable fees and profits for the services that it provides to the plans, but as a fiduciary TLIC is accountable for the reasonableness of those fees.").

As Fidelity admits, the expense ratio includes items in addition to the compensation received by Fidelity, such as the wrap fees discussed above. For this reason, the out-of-circuit authorities cited by Fidelity regarding a fiduciary's purported freedom to negotiate its own compensation with no fiduciary constraints do not foreclose Plaintiffs' claim. Here, the excessive expense ratios are part and parcel of Plaintiffs' mismanagement claim: the combination of the high expense ratio for the MIP and the MIP's low investment returns combined to generate a return to Plaintiffs that was substantially less than inflation and substantially less than peer stable value funds. Furthermore, as the court held in *Santomenno*, a fiduciary may charge only reasonable fees, even if its compensation was purportedly negotiated at arms-length.

The fact that Plaintiffs challenge the expense ratio as a whole also precludes Fidelity's reliance on ERISA's statute of repose. As alleged in the Complaint, the expense ratio increased by ten basis points from 2012 to 2015. Compl. ¶¶ 72 & 74.

---

[3] The Eighth Circuit recently decided *McCaffree Financial Corp. v. Principal Life Ins. Co.*, __ F.3d __, 2016 WL 98332 (Jan. 8, 2016). In that case, the defendant claimed it was a "service provider" and thus owed no fiduciary duty to the plaintiff with respect to fees. Here, Fidelity is the trustee for the MIP, its fiduciary status with respect to the administration of the MIP cannot be questioned, and it actually exercised that authority with respect to fees. Furthermore, the opinion in *McCaffree* relied heavily on the Court's interpretation of the operative contract between the plan and the purported service provider. There is no such contract in the record here.

Whether the fees Fidelity caused to be charged in connection with the MIP were reasonable and/or allowed by contract cannot be decided on a motion to dismiss. Plaintiffs have adequately alleged that the MIP fees were excessive both with reference to industry standards and Fidelity's own conduct in selectively offering an MIP share class with a lower fee.

### H.    ERISA's STATUTE OF REPOSE DOES NOT BAR PLAINTIFFS' CLAIM.

Finally, Fidelity seeks dismissal "to the extent" that Plaintiffs' claim depends on conduct that occurred six years or more before the Complaint was filed. As is clear from the Complaint, however, the conduct that occurred prior to 2009 (Fidelity's excessively risky investment strategy that caused losses) is referenced only as part of the context that gave rise to Fidelity's more recent breaches when it adopted and *maintained* an excessively conservative strategy while simultaneously increasing fees for itself and the wrap providers. *See Tibble*, 135 S. Ct. at 1829 ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely.")

The fact that Fidelity's later investment strategy was in some sense motivated by conduct that occurred prior to the repose period does not immunize the later strategy from challenge under ERISA. And while the harm from the earlier investment strategy could in theory continue to be felt in later years due to the amortization feature of stable value funds, an expert can distinguish between "lingering" injury from the earlier strategy and injury arising from the later strategy even if Plaintiffs were barred from recovery for the former.

## IV.    CONCLUSION

For the foregoing reasons, Fidelity's motion to dismiss should be denied. In the alternative, if the Court identifies any deficiency in the Complaint, Plaintiffs request leave to amend pursuant to Fed. R. Civ. Proc. 15(a)(2).

DATED this 3rd day of February, 2016.

<div style="margin-left:40%">

By: */s/ Paul T. Sullivan*
  Paul T. Sullivan (BBO # 659413)
  Jeffrey A. Gordon (BBO # 685981)
  ZELLE LLP
  600 Worcester Road, Suite 101
  Framingham, Massachusetts 01702
  Telephone:  (781) 4660700
  Facsimile:  (781) 466-0701
  psullivan@zelle.com
  jgordon@zelle.com

  Christopher Micheletti (*pro hac vice*)
  Heather T. Rankie (*pro hac vice*)
  ZELLE LLP
  44 Montgomery Street, Suite 3400
  San Francisco, California 94104
  Telephone: (415) 633-1912
  Facsimile: (415) 693-0770
  cmicheletti@zelle.com
  hrankie@zelle.com

  */s/ Garrett W. Wotkyns*
  Garrett W. Wotkyns (*pro hac vice*)
  Michael McKay (*pro hac vice*)
  SCHNEIDER WALLACE COTTRELL
  KONECKY WOTKYNS LLP
  8501 N. Scottsdale Rd., Suite 270
  Scottsdale, Arizona  85253
  Telephone: (480) 428-0145
  Facsimile: (866) 505-8036
  gwotkyns@schneiderwallace.com
  mmckay@schneiderwallace.com

  Todd Schneider – SBN 158253 (*pro hac vice*)
  Mark Johnson – SBN 76904 (*pro hac vice*)
  Kyle G. Bates (*pro hac vice*)
  SCHNEIDER WALLACE COTTRELL
  KONECKY WOTKYNS LLP
  2000 Powell Street, Suite 1400
  Emeryville, CA 94608
  Telephone: (415) 421-7100
  Facsimile: (415) 421-7105
  tschneider@schneiderwallace.com
  mjohnson@schneiderwallace.com
  kbates@schneiderwallace.com

</div>

Matthew Righetti (*pro hac vice*)
Michael Righetti (*pro hac vice*)
RIGHETTI GLUGOSKI, P.C.
456 Montgomery Street, Suite 1400
San Francisco, CA  94104
Telephone: (415) 983-0900
Facsimile:  (415) 397-9005
matt@righettilaw.com
mike@righettilaw.com

*Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be served upon any party or counsel of record who is not a registered participant of the Court's ECF system, as indicated by the Court, on this 3rd day of February, 2016.

*/s/ Paul T. Sullivan*