THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————— )
                            )
JAMES ELLIS and WILLIAM PERRY )
                            )      Case No.: 1:15-cv-14128-WGY
          The Plaintiffs, )
                            )      **ORAL ARGUMENT REQUESTED**
                v.             )
                            )
FIDELITY MANAGEMENT TRUST )
COMPANY, )
                            )
           Defendant. )
———————————————————— )

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Brian D. Boyle (*pro hac vice*)
Gregory F. Jacob (*pro hac vice*)
Meaghan VerGow (*pro hac vice*)
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300

John J. Falvey, Jr. (BBO# 542674)
Alison V. Douglass (BBO# 646861)
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

I.      STABLE VALUE FUNDS SERVE AS SAFE OPTIONS IN 401(K) PLANS ...................4

II.     "WRAP CONTRACTS" ARE ESSENTIAL FOR PRINCIPAL PROTECTION IN
STABLE VALUE FUNDS, BUT DO NOT PROTECT AGAINST ALL RISKS .........................5

III.    FIDELITY EMPLOYED A RIGOROUS PROCESS FOR MANAGING MIP THAT
RECURRENTLY FOCUSED ON THE VERY ISSUES ABOUT WHICH PLAINTIFFS NOW
COMPLAIN...............................................................................................................................7

IV.     FIDELITY FULLY DISCLOSED MIP'S INVESTMENT ALLOCATIONS, LEVEL OF
RISK, AND PERFORMANCE ....................................................................................................10

LEGAL STANDARD...............................................................................................................11

ARGUMENT ...........................................................................................................................11

I.      PLAINTIFFS' PRUDENCE CLAIM FAILS AS A MATTER OF LAW BECAUSE
UNDISPUTED FACTS DEMONSTRATE THAT FIDELITY EMPLOYED A PRUDENT
PROCESS WHEN MAKING INVESTMENT DECISIONS FOR MIP .........................................13

II.     PLAINTIFFS' ATTEMPTS TO CHARACTERIZE THEIR CLAIM AS ANYTHING
OTHER THAN A HINDSIGHT ATTACK FAIL ...........................................................................15

A.      Plaintiffs' First Argument: "MIP's Crediting Rate Was Uncompetitive." ...........................16

B.      Plaintiffs' Second Argument: "Fidelity Knew MIP's Crediting Rate Was Uncompetitive,
But Did Nothing About It." .............................................................................................................17

C.      Plaintiffs' Third Argument: "It Was Foreseeable That More Mortgages Would Yield
Greater Returns." ...........................................................................................................................18

CONCLUSION.........................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
  446 F.3d 728 (7th Cir. 2006) ...............................................................................................15

*Barchock v. CVS Health Corp.*,
  No. 1:16-cv-00061 (D.R.I. Jan. 31, 2017) ......................................................................15, 17

*Bunch v. W.R. Grace & Co.*,
  532 F.Supp.2d 283 (D. Mass. 2008) .............................................................................. *passim*

*Bunch v. W.R. Grace & Co.*,
  555 F.3d 1 (1st Cir. 2009)................................................................................................ *passim*

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983) ...............................................................................................11

*Dow v. United Brothers of Carpenters & Joiners of Am.*,
  1 F.3d 56 (1st Cir. 1993)........................................................................................................11

*Fici v. Lucent Techs, Inc.*,
  581 F. Supp. 2d 143 (D. Mass. 2008) ....................................................................................11

*Lavalley v. Quebecor World Book Svcs. LLC*,
  315 F. Supp. 2d 136 (D. Mass. 2004) ....................................................................................11

*Medina-Munoz v. R.J. Reynolds Tobacco Co.*,
  896 F.2d 5 (1st Cir. 1990).......................................................................................................11

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v.
  Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013)....................................................................................................13

*Roth* v. Sawyer-Cleator
  16 F.3d at 917-918 ..................................................................................................................16

**Statutes**

29 U.S.C. § 1104(a)(1)(B) .............................................................................................................13

**Other Authorities**

72 Fed. Reg. 60,451, 60,461-63 (Oct. 24, 2007) ...........................................................................4

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Employee Retirement Income Security Act of 1974 ......................................................................1

Jack VanDerhei, "The Impact of the Recent Financial Crisis on 401(k) Balances,"
   Employee Benefit Research Institute, February 2009 ..............................................................4

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................................1

Fed. R. Civ. P. 56(a) ..................................................................................................................11

**Regulations**

29 C.F.R. 2550.404a-1(b)(i) .......................................................................................................13

29 C.F.R. § 404c-1(b)(1)(ii) .........................................................................................................4

29 C.F.R. § 404c-1(b)(2) ..............................................................................................................4

29 C.F.R. § 404c-1(b)(3) ..............................................................................................................4

29 C.F.R. § 404c-1(b)(3)(i) ...........................................................................................................4

Defendant Fidelity Management Trust Company ("Fidelity") submits this Memorandum in Support of Its Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56.  The undisputed material facts show that Plaintiffs cannot as a matter of law sustain a claim under the Employee Retirement Income Security Act of 1974 ("ERISA").

## INTRODUCTION

Plaintiffs are a class of 401(k) plan participants who invested in the Managed Income Portfolio ("MIP"), a stable value fund managed by Fidelity and offered to 401(k) plans.  After substantial narrowing of the issues, the sole remaining question before the Court is whether Fidelity violated its fiduciary duty to prudently manage MIP during the class period (January 1, 2010 until today) by failing to inject it with more risk.  Plaintiffs contend that MIP—offered as a "safe" option for 401(k) plans—was *too* safe, and that Fidelity should have sought to achieve greater returns for MIP by purchasing more securitized mortgages and fewer Treasuries, and by increasing the portfolio's duration.[1]  Plaintiffs assert that a substantial majority of other stable value funds pursued riskier strategies of this kind early in the class period, and claim that, because MIP did not, its returns to investors lagged the industry average.

Accepting these facts as true, Fidelity is entitled to judgment as a matter of law for two reasons.  First, the First Circuit limits judicial review of investment management decisions under ERISA to ascertaining whether the fiduciary employed a prudent process.  "[T]he test of prudence—the Prudent Man Rule—is one of *conduct*, and not a test of the result of performance of the investment."  *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009), *aff'g*  532 F.

---

[1] While the Complaint initially contained additional allegations, the plaintiffs' sole expert has identified these two elements as MIP's only alleged inadequacies.  *See* Statement of Undisputed Material Facts in Support of Defendant Fidelity Management Trust Company's Motion for Summary Judgment ("SUMF") at ¶ 170.

Supp. 2d 283 (D. Mass. 2008) (Young, J.).  There is no genuine dispute of fact as to Fidelity's

rigorous  process for managing MIP.  Fidelity regularly and thoroughly examined its investment

strategy for MIP and arrived at considered judgments about the appropriate level of risk,

including both mortgage holdings, Treasuries, and duration, with the benefit of experienced

investment managers, state-of-the-art analytic tools, and a high degree of management oversight.

A trial on Fidelity's investment management process is not needed because none of these facts

are subject to dispute.

Second, plaintiffs' critique is precisely the type of hindsight attack that has been

unequivocally rejected by the First Circuit as a basis for liability under ERISA.  *Bunch*, 555 F.3d

at 7 ("[W]hether a fiduciary's actions are prudent cannot be measured in hindsight….").  While

stable value funds that invested in more securitized mortgages may have achieved higher returns

than MIP, that  result was not knowable in advance.  Indeed, this case is the very definition of a

hindsight claim.  Securitized mortgages were the epicenter of the financial crisis from which the

nation was only beginning to emerge as of the date this class period commenced on January 1,

2010.  Had plaintiffs come to this Court in January 2010 and sought an injunction compelling

Fidelity *as a matter of prudence* to purchase more securitized mortgages for MIP, they would

have been laughed out of the courtroom.   If it would have been ludicrous to insist that such

investment decisions were mandated by ERISA at the time that the decisions were being made, it

is hindsight to come into court now and seek damages based on "expert" testimony that it was

"foreseeable" that securitized mortgages would offer more return than risk.  Such

"foreseeability" is the luxury of those with a rear-view mirror.

Nor does evidence that MIP's returns were below "average" warrant a trial.[2]  ERISA does not require investment managers to engage in herd behavior and aim to replicate the returns of the "average" fund.  The whole concept of 401(k) plans is that plan fiduciaries can select for inclusion in their plans from a variety of investment alternatives with different risk/reward characteristics.  Some stable value funds are conservative; others take more risk.  In certain environments, the more conservative funds will outperform the more risky funds; in other environments, the more risky funds will outperform the more conservative.  If a conservative investment manager is to be held liable whenever its fund does not achieve "average" returns, then investment managers will in essence be compelled to follow an "average" risk strategy, meaning that more conservative investment options will no longer be available, even for plans that prefer a more conservative strategy for the "safe" option in their 401(k) plan.  The principles that this Court articulated in *Bunch* were intended to avoid precisely this kind of counterproductive result.

There is no claim here that any MIP investor sustained any losses.  To the contrary, MIP investors preserved all of their principal and earned modest returns.  Plaintiffs' claim is that MIP—the investment option that was offered as the "safe" investment in their 401(k) plans— should have taken more risk and earned even higher returns.  But there is no such thing as an investment that provides both the comfort of low risk *and* the potential returns that come with greater risk.  It is inconsistent with the law—and simply wrong—to allow investors who chose the safety of a low-risk investment to now demand that the court award them the return that, in hindsight, we now know they could have earned with a higher-risk choice.

_____

[2] If this case goes to trial, Fidelity will prove that those "averages" are misleading for a number of reasons, none of which need be addressed for purposes of this motion.

## BACKGROUND

### I.      STABLE VALUE FUNDS SERVE AS SAFE OPTIONS IN 401(K)  PLANS

By definition, 401(k) retirement plans offer "a broad range of investment alternatives" with "materially different risk and return characteristics."  29 C.F.R. § 404c-1(b)(3)(i); *see also* SUMF ¶ 3.  The fiduciaries for the 401(k) plan select which investment alternatives to include, and participating employees then allocate their retirement savings among those alternatives based on their own needs and preferences, including their tolerance for risk.  SUMF ¶¶ 1-2, 6.

Department of Labor ("DOL") regulations generally require plans to offer at least one investment option that is "safe," *i.e.*, an "income producing, low risk, liquid" investment.  29 C.F.R. §§ 404c-1(b)(1)(ii), (b)(2), (b)(3); *see also* SUMF ¶ 3.  Two kinds of investment options predominantly fill this "safe" role—money market funds and stable value funds, SUMF ¶¶ 4-5— both of which are considered "capital preservation vehicles."  Default Investment Alternatives Under Participant Directed Individual Account Plans, 72 Fed. Reg. 60,451, 60,461-63 (Oct. 24, 2007).  The availability of "safe" investment options that are designed to preserve principal is particularly important for investors—especially older investors—who cannot afford to have their retirement savings wiped out during a financial crisis.  SUMF ¶ 6.  Older investors own more than 75% of MIP.  SUMF ¶ 27.[3]  The wisdom of the DOL's insistence on the availability of a "safe" investment option was borne out during the financial crisis:  whereas the average substantial 401(k) plan balance was down more than 25% during the crisis,[4] investments in MIP (and in other stable value funds that survived) were fully preserved.

---

[3] Over 75 percent of MIP balances are held by participants 50 years of age or older, and the allocation to MIP generally increases with age.  SUMF ¶¶ 27-28.

[4] Jack VanDerhei, *The Impact of the Recent Financial Crisis on 401(k) Balances*, Emp. Benefit Research Inst. (Feb. 2009).  SUMF ¶ 148; Jacob Decl., ¶ 8, Ex. E.

MIP is governed by a "Declaration of Separate Fund" ("DSF") that expressly features the fund's capital preservation objective: "The primary investment objective of the Portfolio is to seek the preservation of capital, as well as to provide a competitive level of income over time consistent with the preservation of capital." SUMF ¶¶ 29, 31. Plan sponsors wishing to offer MIP must sign a Participation Agreement acknowledging that the DSF establishes Fidelity's duties with respect to the management of MIP. SUMF ¶¶ 30, 44.

## II.   "WRAP CONTRACTS" ARE ESSENTIAL FOR PRINCIPAL PROTECTION IN STABLE VALUE FUNDS, BUT DO NOT PROTECT AGAINST ALL RISKS

Essential to the principal protection feature of stable value is a form of insurance known as the wrap contract. Wrap contracts are a form of catastrophic insurance coverage that, subject to certain exceptions, provides that, if there is not enough money left in the stable value fund to pay withdrawing investors their full principal (plus credited interest), the party providing the wrap insurance (known as the "wrap provider" or the "wrapper") will step in and make up the difference. SUMF ¶¶ 7, 13.

The availability of wrap coverage cannot be taken for granted. Wrap providers are generally large banks or insurance companies, many of whom were under severe pressure to shed risk as they began to emerge from the financial crisis. SUMF ¶¶ 69, 153-57. As a result, several wrap providers decided to discontinue or dramatically reduce their wrap business, in some cases making wrap insurance available to only lower-risk stable value funds.[5] SUMF ¶¶ 23, 151-58. One of MIP's wrap providers, AIG, nearly failed during the financial crisis, SUMF ¶ 152, which would have left MIP without principal protection for a material portion of the fund. By early 2011, more than half of MIP's wrap coverage was in jeopardy, with two of its five wrap

---

[5] Even in the absence of a fund manager's breach, wrap providers can always effect a form of delayed contract cancellation called "immunization." SUMF ¶¶ 23.

providers (Rabobank and JPM) having announced their intention to exit the wrap market, and AIG under government control and thought to be on its way out.  SUMF ¶¶ 153-57.  For several years after AIG's near-failure in September 2008, the need to position MIP in light of the concern that a substantial portion of its wrap coverage appeared to be exiting remained a compelling priority for Fidelity in determining MIP's investment strategy.  SUMF ¶¶ 150-51.

Even when a stable value fund is able to obtain wrap coverage, fund managers must keep in mind that, like any insurance policy, wrap coverage does not pay out in all circumstances. SUMF ¶¶ 14-25.  For example:

(i) Wrap contracts exclude from coverage certain kinds of investment losses, such as impaired securities.  SUMF ¶¶ 18-19.  If a fund chases yield with a portfolio of higher risk securities that then become impaired, participants cannot rely on the wrap contract to be made whole.  SUMF ¶ 19.

(ii) Wrap contracts do not guarantee that investors will earn income on their preserved principal.  SUMF ¶ 25.  If a stable value fund invests in higher risk securities that perform poorly, investors may experience poor returns in the form of sustained low (or even zero) returns.  SUMF ¶ 25.  Plaintiffs' attorneys have sued J.P. Morgan ("JPM") on precisely this theory, arguing that JPM made excessively risky investments with its stable value funds that caused investors to earn low returns.  SUMF ¶ 164; Jacob Decl., Ex. D (JPM Compl. ¶¶ 6-12, 15, 19).

(iii) Wrap contracts permit wrap providers to immediately cancel the contract, including their payment obligation, for an uncured breach of the contract's terms, such as breaches of specified investment limitations.  SUMF ¶ 22.

Plaintiffs' expert concedes that prudent stable value fund managers account for such uncovered risks in making investment decisions.  SUMF ¶ 17-19.

### III.   FIDELITY EMPLOYED A RIGOROUS PROCESS FOR MANAGING MIP THAT RECURRENTLY FOCUSED ON THE VERY ISSUES ABOUT WHICH PLAINTIFFS NOW COMPLAIN

It is not subject to dispute that Fidelity employs a rigorous process for making investment decisions for MIP.  SUMF ¶¶ 55-68, 78-140.  Fidelity's stable value portfolio managers work as a team to develop MIP's investment strategy, using a variety of cutting edge analytic tools to guide their decision-making.  SUMF ¶¶ 78-86, 102, 107-13.  Other Fidelity employees assist them in those tasks on a daily basis by providing insight into market conditions, key investment opportunities, the risk/reward attributes of various market segments, and quantitative modeling of the potential outcomes of different investment strategies.  SUMF ¶¶ 87-106.

Every day, Fidelity applies these resources to make investment decisions for MIP that are intended to optimize its performance in light of its stated investment objective.  SUMF ¶¶ 114-16.  On any given day, Fidelity may thus reject several investment opportunities or strategies as inappropriate for MIP, while executing on others that Fidelity determines are consistent with MIP's overall strategy, do not inappropriately threaten capital preservation, and will help MIP deliver competitive returns to investors over time.  SUMF ¶ 115.  Each and every one of these decisions is made with the goal of optimizing MIP's performance.  SUMF ¶¶ 114-16.

Throughout the class period, this investment process was subject to rigorous oversight by senior Fidelity management.  SUMF ¶¶ 130–40.  Every six weeks, the stable value portfolio managers participated in a formal meeting with their chief investment officer to review the sector allocations, risk positioning, and performance of each stable value portfolio, as well as other strategic issues such as the ongoing efforts to resolve the wrap availability crisis.  SUMF ¶¶ 131-

7

34.  The stable value portfolio managers also made presentations at least twice each year to the FMTC Trust/Investment Oversight Committee, a body including some of Fidelity's most experienced investment professionals, that is charged with direct oversight responsibility for the stable value portfolios managed by Fidelity.  *Id.* ¶¶ 135-39.  Presentations and minutes from those meetings reflect recurring review of the investment strategy, sector allocation, risk level, and performance of the stable value portfolios, potential opportunities to improve yield, and the wrap capacity crisis.  SUMF ¶¶ 138-39.  Jack Haley, the president of FMTC, regularly updated the FMTC Board of Directors about key issues impacting the stable value portfolios.  SUMF ¶ 140.

This robust process recurrently focused at all levels on the *very* issues about which Plaintiffs now complain:  MIP's mortgage and Treasury holdings, its duration, and the competitiveness of its returns.

- *Mortgages and Treasuries*:  Fidelity's stable value portfolio managers continuously evaluated MIP's mortgage and Treasuries holdings, both on an informal basis and through structured, regularly scheduled meetings.  SUMF ¶¶ 117-126, 130-40.  On a bi-weekly basis, Fidelity conducted two separate cross-disciplinary meetings—a "mortgage" meeting and a "rates" meeting—in which traders, fundamental research analysts, quantitative analysts, and the stable value portfolio managers all participated.  SUMF ¶¶ 118-19.  Fidelity's teams of experts—including a team that focuses solely on securitized mortgages and other structured products—also routinely issued a variety of reports analyzing and assessing the performance of mortgages and Treasuries over various historical periods, their contributions to MIP's returns, current market conditions affecting each, and the pros and cons of specific kinds of

8

mortgage investment opportunities.  SUMF ¶¶ 119-22.  The portfolio managers relied on these resources, and on Fidelity's state-of-the-art analytic tools, to construct scenario analyses and projections that evaluated the risk/reward tradeoffs of potential alternative mortgage and Treasury allocations, and to decide on the optimal allocations for MIP.  SUMF ¶¶ 121-25.  The portfolio managers reviewed their decisions concerning sector allocations with their chief investment officer every six weeks, SUMF ¶¶ 130-34, and reported their chosen stable value sector allocations at every oversight meeting of the Trust/Investment Committee, together with an assessment of which sectors offered strategic investment opportunities.  SUMF ¶¶ 135-39.  Through this process, Fidelity made adjustments to MIP's mortgage and Treasuries holdings across the class period in response to changing market conditions.  SUMF ¶ 126 (fund fact sheets showing changes in sector allocations).

- *Duration*:  Duration is a measure of interest rate risk; all else equal, when interest rates go up, the value of fixed income securities goes down.  SUMF ¶¶ 51-52.  A portfolio with longer duration has greater exposure to interest rate changes and, therefore, more risk.  MIP portfolio manager Robert Chan testified at his deposition that "We revisit the topic [of duration] on a periodic basis because that's part of the exercise of asking and challenging ourselves . . . . . And that's where we run our scenario analysis based on forward-looking information, our best guess of what forward-looking means at every single point in time."  SUMF ¶ 58.  The record of Fidelity's investment management process shows that the portfolio managers repeatedly considered alternative durations for the stable value portfolios.  SUMF ¶¶ 57-59.  Fidelity's teams of experts routinely analyzed historical and current

9

information concerning interest rates and their impact on the returns of the stable

value portfolios, and created scenario analyses for the portfolio managers showing the

potential impact on those returns (both positive and negative) of shifts in portfolio

duration.  SUMF ¶¶ 60-61, 100-07.  Each time during the class period that the

portfolio managers considered making substantial changes to MIP's duration, they

determined after an analysis of all available information that MIP's current duration

(generally ranging between 2.5 and 2.6 years) offered the most appropriate risk-

reward tradeoff for MIP.  SUMF ¶¶ 56, 60-61.

- *Competitiveness of returns*:  Fidelity's stable value portfolio managers regularly

  obtained and reviewed information concerning the sector allocations, duration, and

  crediting rates of competing stable value funds.  SUMF ¶ 127. Plaintiffs' expert

  conceded that Fidelity succeeded in understanding its competitors' investment

  strategies.  SUMF ¶ 128.  While Fidelity took such information into account, it did

  not seek to replicate the actions of other investment managers; indeed, the record

  reflects Fidelity's determinations that the risks competitors were taking were not

  appropriate for the MIP.  SUMF ¶¶ 127-29.

## IV.    FIDELITY FULLY DISCLOSED MIP'S INVESTMENT ALLOCATIONS, LEVEL OF RISK, AND PERFORMANCE

On a quarterly basis, Fidelity made "fund fact sheets" available to all plan sponsors that

offer MIP.  SUMF ¶¶ 45-47.  The fund fact sheets clearly disclose the very facts about which

plaintiffs complain, including MIP's allocation to various investment sectors (including

mortgage-backed securities and Treasuries), its duration, and its returns.  SUMF ¶ 47.

Fiduciaries of such highly sophisticated plans as those sponsored by Wachtell Lipton, Sullivan &

Cromwell, Citadel Investment Group, Blackstone, Brooks Brothers, Heinz, Hyundai, Nvidia,

LVMH, and Yamaha, SUMF ¶ 63, chose MIP for their plans with full disclosure of how conservative the fund was.  Numerous non-Fidelity stable value funds were available to these plans, (SUMF ¶ 62); with full disclosure of the MIP's allocation strategy and duration, they chose MIP as the most appropriate "safe" option to offer in their plans.

## LEGAL STANDARD

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To avoid a properly supported summary judgment motion, an adverse party "must set forth specific facts showing that a genuine issue exists." *La Valley v. Quebecor World Book Serv. LLC*, 315 F. Supp. 2d 136, 142-43 (D. Mass. 2004) (Young, J.).  Moreover, the facts set forth in opposition to the motion must be supported by "significant probative evidence." *Dow v. United Bros. of Carpenters & Joiners of Am.*, 1 F.3d 56, 58 (1st Cir. 1993).  "'[C]onclusory allegations, improbable inferences, and unsupported speculation' are insufficient to establish a genuine dispute of fact." *Fici v. Lucent Techs., Inc.*, 581 F. Supp. 2d 143, 146 (D. Mass. 2008) (Young, J.) (*quoting Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

## ARGUMENT

Plaintiffs' imprudence claim is nothing more than *Bunch* redux, and is foreclosed by this Court's decision in that case, together with the First Circuit's affirmance on appeal.  *Bunch* establishes two bright line rules for review of ERISA imprudent management claims.  First, "the test of prudence—the Prudent Man Rule—is one of *conduct*, and not a test of the results or performance of the investment." *Bunch*, 555 F.3d at 7, *quoting Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).  "[T]he test is not whether [the defendant] got the best possible return on the investment, but whether it considered all relevant factors in deciding [the

investment's] prudence…." *Bunch*, 532 F. Supp. 2d at 290. Second, "[w]hether a fiduciary's actions are prudent cannot be measured in hindsight…." *Bunch*, 555 F.3d at 7 (citation omitted). "Although hindsight is 20/20 . . . that is not the lens by which we view a fiduciary's actions under ERISA." *Id.* at 10 (citation omitted). On the undisputed facts, Plaintiffs' investment management claim flunks both tests.

Plaintiffs claim that Fidelity breached its duty of prudence by failing to make riskier investments for MIP—specifically, by failing to purchase more securitized mortgages and fewer Treasuries, and by failing to expose MIP to greater interest rate risk by lengthening its duration. *See* n. 1, supra. Plaintiffs seek damages for this alleged breach (in the form of foregone earnings; no plaintiff suffered any actual loss), together with an order compelling Fidelity to invest MIP in the riskier manner they prescribe on a going-forward basis. Comp. PFR ¶¶ C, D. But:

- Plaintiffs are unable to identify any flaws in the process by which Fidelity arrived at the considered judgment that its chosen allocations to mortgages and Treasuries, and its chosen duration, provided an appropriate risk/reward trade-off for MIP. SUMF ¶ 185.

- Plaintiffs admit the incontrovertible: that their proposed riskier strategy could have resulted (and could result in the future) in lower returns. SUMF ¶¶ 163, 167, 172, 176. The fact that the riskier strategies plaintiffs prefer happened to have paid off during the Class Period is thus, by definition, a hindsight complaint.

- Plaintiffs are unable to establish that either the actual level of mortgage and Treasury holdings in MIP, or its duration, were inconsistent with principles of stable value investing; their expert testified that there are no such applicable principles. Nor can they establish that MIP's level of mortgages or Treasuries was inconsistent with what would be found in a "prudent" stable value portfolio. To the contrary, Plaintiffs' expert

concedes his "model" of a prudent stable value fund contained an even higher percentage of Treasuries and an even lower percentage of mortgages than MIP. SUMF ¶¶ 54, 61, 65-67, 173-75, 187–90.

Plaintiffs' case thus boils down to the spare observation that stable value funds that held more mortgages and had longer durations than MIP generally earned higher returns between 2010 and 2014, and that MIP's returns consequently lagged (while steadily converging toward) the industry average. SUMF ¶ 195. *Bunch* conclusively disposes of this purely hindsight-based complaint about the outcomes of an indisputably prudent process.

## I.  PLAINTIFFS' PRUDENCE CLAIM FAILS AS A MATTER OF LAW BECAUSE UNDISPUTED FACTS DEMONSTRATE THAT FIDELITY EMPLOYED A PRUDENT PROCESS WHEN MAKING INVESTMENT DECISIONS FOR MIP

"ERISA [does] not require that a fiduciary maximize the value of investments." *Bunch*, 555 F.3d at 6. Rather, ERISA requires that a fiduciary exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). In *Bunch*, this Court held that this standard is satisfied when a fiduciary investment manager "[takes] the important factors into account when it [makes] its decision," noting in support of this conclusion DOL regulations that "make clear [that] ERISA's prudence requirements 'are satisfied if the fiduciary: (i) [h]as given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved,' and '(ii) [h]as acted accordingly.'" 532 F. Supp. 2d at 291, *quoting* 29 C.F.R. § 2550.404a-1(b)(i). *See also Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (a reviewing court must "focus on a fiduciary's conduct in arriving at an investment

decision, not on its results, and ask whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.") (internal quotation marks omitted).  Plaintiffs' expert testified that it is the industry standard—not just the governing legal standard—to judge the decisions of an investment manager based on the prudence of its process, rather than on the results.  SUMF ¶¶ 184, 191 ("if your process is prudent, then the rate is what the rate is").

There is no need for a trial on the process that Fidelity employed to make investment decisions for MIP, as that process is not subject to dispute.  The record shows that MIP's portfolio managers frequently and thoroughly subjected to thorough analysis the very decisions with which plaintiffs disagree.  These decisions were made under conditions of uncertainty, relying on expert support teams and state-of-the-art analytical tools used to analyze the information necessary to develop investment strategies.  Documentation of Fidelity's investment management process conclusively shows that Fidelity's stable value team regularly examined the subjects of both mortgage holdings and duration, analyzed copious information concerning the risk/reward trade-offs associated with each, and made considered judgments about the most appropriate investment strategy for MIP in light of its established investment objective and then-prevailing market conditions.  *See* Background Section III, SUMF ¶ 55-68, 78-140.

In making these investment decisions, MIP's portfolio managers were subject to rigorous and continuous oversight by senior Fidelity executives, who routinely reviewed MIP's performance, sector allocations (including mortgage holdings), and investment strategies.  *Id.* This process culminated in semiannual reviews by Fidelity's Trust/Investment Oversight Committee, which has direct oversight responsibility for the stable value portfolios managed by

Fidelity. *Id.* Plaintiffs do not point to any flaws in this process; indeed, their expert testified that he had not examined it and has no opinion about it. SUMF ¶ 185.

Plaintiffs may disagree with Fidelity's decisions as to investment strategy, but they have no factual basis for challenging the rigor and conscientiousness of Fidelity's decision-making process. The fact that other investment managers made different decisions—and that, with hindsight, some of the risks they took may have paid off—is no evidence that Fidelity's decision to take a more conservative approach was imprudent. Plaintiffs' unwavering focus on MIP's investment outcomes and the comparison of MIP's returns to industry averages reveals their claim to be nothing more than an impermissible hindsight attack. *Bunch*, 555 F.3d at 6-7. Fidelity's challenged decisions were made under conditions of uncertainty—just like the divestment decision of the plan fiduciaries in *Bunch*—and ERISA does not seat fiduciaries "on a razor's edge" by subjecting them to a continuous threat of liability in the event their considered investment decisions fail to achieve an average level of performance. *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006); *Barchock v. CVS Health Corp.*, No. 1:16-cv-00061, slip op. at 10 (D.R.I. Jan. 31, 2017) ("To require fiduciaries to conform to industry averages would require them to ignore their individual plans' needs and requirements, which is contrary to the core fiduciary standards that govern their conduct.").

## II.   PLAINTIFFS' ATTEMPTS TO CHARACTERIZE THEIR CLAIM AS ANYTHING OTHER THAN A HINDSIGHT ATTACK FAIL

Fidelity expects Plaintiffs to raise several arguments in opposition to summary judgment, each of which is founded in hindsight. A trial is not required to dispense with these arguments, which, being premised on hindsight, fail as a matter of law. *Bunch*, 555 F.3d at 7.

### A.      Plaintiffs' First Argument: "MIP's Crediting Rate Was Uncompetitive."

In depositions, Plaintiffs have highlighted internal Fidelity documents from 2009-2012 noting that MIP's returns were lower than those of certain competitors, or "uncompetitive." These documents do not create a triable issue of fact.  MIP's "competitiveness" is an outcome, and *Bunch* firmly instructs that imprudence claims are not to be decided on the basis of results. *See Bunch*, 555 F.3d at 7 ("The 'test [is] how the fiduciary acted viewed from the perspective of the time of the challenged decision . . . ." (quoting *Roth v. Sawyer-Cleator*, 16 F.3d 915, 917-18 (8th Cir. 1994))); *St. Vincent*, 712 F.3d at 727 ("[A] decline in a security's market price does not, by itself, give rise to a reasonable inference that holding that security was or is imprudent."). Fidelity's after-the-fact observations as to the outcome of its decisions does not mean that Fidelity could have predicted how the market would interact with its decisions at the time those decisions were made.

If this case is tried, there will be extensive evidence that the "uncompetitiveness" of MIP's returns was essentially turned around after the first two years of the class period, and that, even as to those two years, much of the differential between MIP and its competitors is a result of pre-class period investment losses from the financial crisis that were carried forward into class period returns via the stable value "crediting rate" formula (and, being the lingering effects of pre-class period actions, are barred from consideration here by the statute of repose).  The evidence will further show that Fidelity's competitors took substantial risks to achieve their higher returns—risks that could have jeopardized their ability to preserve principal, had the market behaved differently.  For present purposes, however, this evidence is not relevant because the process that Fidelity used to reach those outcomes was undisputedly rigorous, and Plaintiffs cannot rely on outcomes to establish liability.

### B.      Plaintiffs' Second Argument: "Fidelity Knew MIP's Crediting Rate Was Uncompetitive, But Did Nothing About It."

Plaintiffs' anticipated assertion that Fidelity "did nothing" to improve MIP's returns in the first part of the class period is contradicted by their own expert's testimony that Fidelity took steps to increase MIP's risk throughout the class period.[6]  It is also irreconcilable with voluminous evidence that Fidelity made ongoing adjustments to MIP's portfolio throughout the class period, including adjustments that added risk.  SUMF ¶¶ 55-68, 78-140, 169.  Thus, plaintiffs do not actually assert that Fidelity failed to add risk to MIP during the class period; rather, their claim is that Fidelity did not add as much risk as they (with the benefit of hindsight) believe would have been ideal.

This entire line of argument is founded on the fallacy that an investment manager's *only* prudent response to the knowledge that competitors are delivering higher yields by assuming greater risks is to incur the same level of risk.  That assumption—which would force all stable value fund managers to adopt essentially the same risk profile in a herd—cannot be reconciled with the foundational premise of 401(k) plan investing, which contemplates the availability of a broad range of investment alternatives with a variety of risk/reward characteristics.  *Barchock*, No. 1:16-cv-00061, slip op. at 10.  It is also flatly inconsistent with ERISA as interpreted by the First Circuit.  What Fidelity indisputably "did" in response to its relatively lower returns in 2010 and 2011 was to "ma[k]e an assessment after appropriate and thorough investigation," and to

---

[6] Plaintiffs' expert concedes that Fidelity took steps to increase MIP's risk as early as 2010— the very first year of the class period.  SUMF ¶ 169 ("the graphs that I've produced . . . certainly indicate that there's been an increase in the aggressiveness of the portfolio over time").  And as noted, Plaintiffs' own data shows that MIP's crediting rate continuously converged toward the industry average throughout the class period.  SUMF ¶ 195.

adopt an investment strategy "based on the facts *then known*."  *Bunch*, 555 F.3d at 10 (emphasis in original).  Fidelity thereby fulfilled its duty to engage in a prudent process for managing MIP.

Plaintiffs' faulty assumption that only decisions that caused MIP to incur *more* risk count as steps taken to improve MIP's returns is purely a product of their hindsight bias.  Fidelity's stable value team made considered investment judgments every day that were intended to improve MIP's return to investors.  On those occasions when Fidelity decided after thorough analysis of relevant considerations to keep MIP in a more conservative posture, it was with the expectation that doing so would cause MIP to achieve relatively *higher* returns in reasonably possible down markets, and would also assist MIP in obtaining essential wrap coverage.  Plaintiffs' assertion that Fidelity "did nothing" to improve MIP's returns during periods when it was making numerous strategic moves to safeguard MIP against downside risk—as was the case in the years immediately following the financial crisis—is on closer examination not a critique of Fidelity's process, but rather is merely a retread of Plaintiffs' legally non-viable hindsight attack.

Finally, documents showing debates within Fidelity about optimal investment strategy, sparked by attention to competitors' different strategic choices (and, hence, different outcomes), is no evidence of a flawed process.  To the contrary, it is yet another indicium of a *healthy* process.  It is in a healthy environment with a fiduciary-focused culture that investment professionals observe and reflect on the actions of competitors, and continue to strive for improvement.  *Bunch* encourages plan fiduciaries to conduct and to document precisely such a process; allowing it to serve as a basis of liability would have the exact opposite effect.

### C.      Plaintiffs' Third Argument: "It Was Foreseeable That More Mortgages Would Yield Greater Returns."

The report submitted by Plaintiffs' expert, Dr. Pomerantz, is founded on the proposition that it was "foreseeable" that his model portfolio of more securitized mortgages would

outperform the more conservative investment strategy pursued by Fidelity.  That claim is absurd on its face; if there were such a knowably superior investment mix, every money market fund and other lower-risk, lower-reward investment option on the planet would be *per se* imprudent and soon out of business.  The Court does not require a trial to reject Dr. Pomerantz's assertion that he has discovered such a magical investment elixir.  Indeed, if Dr. Pomerantz is correct, then the DOL is wrong in even permitting—much less requiring—"safe" investments (including money markets) in 401(k) plans, since it would be imprudent to offer a "safe" investment when a higher-risk investment will *predictably* outperform.

One need look no further than the financial crisis of 2008-2009 to know that historical observations about mortgage performance do not always pan out.  No one knew in 2010 or 2011 how securitized mortgages were going to perform in succeeding years, and it was not imprudent for Fidelity to offer a conservative investment alternative that plan participants could use, at their option, to weather financial storms.  *See Bunch*, 555 F.3d at 10 (holding that ERISA fiduciary acted prudently when it sold stock that subsequently increased in value given the "real possibility" at the time of sale that the "stock could very well become of little value or even worthless to the [P]lan").

## CONCLUSION

As in *Bunch*, "[t]his is not a case where . . . plaintiffs can argue that they were tricked into losing huge amounts of money as a result of an alleged breach of fiduciary duty."  532 F. Supp. 2d at 290.  It is undisputed that no member of the class experienced any loss, and that every MIP investor in fact earned steady positive returns many times greater than money market returns in every quarter of the class period.  SUMF ¶ 192–94.  "The most the [] plaintiffs can argue, therefore, is that they could have earned *more* money" if Fidelity had made riskier

investments.  *Bunch*, 532 F. Supp. 2d at 290 (emphasis in original).  That hindsight-based claim

is dead on arrival under *Bunch*, and this Court need not resolve any disputed issue of fact to grant

summary judgment to Fidelity.[7]

Dated: February 17, 2017                     Respectfully submitted,

                                             FIDELITY MANAGEMENT TRUST
                                             COMPANY

                                             By its attorneys,

                                             */s/ Gregory Jacob*
                                             Brian D. Boyle (*pro hac vice*)
                                             Gregory F. Jacob (*pro hac vice*)
                                             Meaghan VerGow (*pro hac vice*)
                                             O'Melveny & Myers LLP
                                             1625 Eye Street, N.W.
                                             Washington, D.C. 20006
                                             Tel.: (202) 383-5300
                                             bboyle@omm.com
                                             gjacob@omm.com
                                             mvergow@omm.com

                                             John J. Falvey, Jr. (BBO# 542674)
                                             Alison V. Douglass (BBO# 646861)
                                             Goodwin Procter LLP
                                             100 Northern Avenue
                                             Boston, MA 02210
                                             Tel: (617) 570-1000
                                             jfalvey@goodwinlaw.com
                                             adouglass@goodwinlaw.com

---

[7] This motion and the motion filed today to exclude Plaintiffs' expert (the "*Daubert*" motion) rest on entirely independent grounds, although allowance of either motion would dispose entirely of Plaintiffs' Complaint.  To resolve Fidelity's summary judgment motion, the Court need not consider whether the opinions of Plaintiffs' expert are admissible, because Plaintiffs' "hindsight" claim fails as a matter of law, as well as on the undisputed facts as to Fidelity's process.  The *Daubert* motion would dispose of the Complaint on the independent ground that the expert report —which is the foundation of both Plaintiffs' liability and damages claims—is unreliable and unhelpful to the finder of fact, and so should be excluded.  In the absence of that report, Plaintiffs have no case to put on.  Accordingly, either motion would dispose of this case *in toto*, but neither depends on the other.

## **CERTIFICATE OF SERVICE**

I, Gregory F. Jacob, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 17, 2017.

*/s/ Gregory Jacob*
Gregory F. Jacob