UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
JAMES ELLIS and WILLIAM PERRY,  )
individually and as representatives )
of a class of similarly situated )
persons,                        )
                                )
            Plaintiffs,         )
                                )
        v.                      )        CIVIL ACTION
                                )        NO. 15-14128-WGY
FIDELITY MANAGEMENT TRUST COMPANY, )
                                )
            Defendant.          )
_____)
```

YOUNG, D.J.                                      June 19, 2017

### MEMORANDUM & ORDER

## I.  INTRODUCTION

In this class action, James Ellis ("Ellis") and William Perry ("Perry"), representing a class of similarly situated individuals (collectively, the "Plaintiffs"), contend that Fidelity Management Trust Company ("Fidelity") mismanaged the Fidelity Group Employee Benefit Plan Managed Income Portfolio (the "Portfolio"), breaching its fiduciary duties pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") section 404(a), 29 U.S.C. § 1104(a).  Fidelity here moves for summary judgment, asserting that the Plaintiffs fail to establish a breach of either the duty of loyalty or the duty of prudence.  Taking all reasonable inferences in the Plaintiffs'

favor, the Plaintiffs do not carry their burden to set forth evidence to establish a fiduciary breach.   Thus, this Court grants Fidelity's motion for summary judgment.

### A.   Procedural History

On December 11, 2015, Ellis and Perry filed a complaint against Fidelity asserting a breach of fiduciary duty under ERISA section 404(a), 29 U.S.C. § 1104(a).   Compl., ECF No. 1. Following this Court's denial of a motion to dismiss, Order, ECF No. 43; Def.'s Mot. Dismiss Compl., ECF No. 21, Fidelity answered the complaint, Def.'s Answer Pls.' Class Action Compl. ("Answer"), ECF No. 48.

On December 14, 2016, this Court granted Ellis and Perry's unopposed motion to certify a class, Pls.' Mot. Class Certification, ECF No. 64; Def.'s Mem. Resp. Pls.' Mot. Class Certification 6, ECF No. 78, of "[a]ll participants in defined contribution employee pension benefit plans within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), who invested in the [Portfolio] from January 1, 2010 until the time of trial."   WGY Order 1, ECF No. 80.   The Court allowed this class to pursue the Plaintiffs' investment management claim, deeming their excessive fees claims waived.   Id. at 1-2, 1 n.1.

Fidelity now moves for summary judgment.   Def.'s Mot. Summ. J., ECF No. 97.   The parties have briefed the issues and submitted statements of facts.   Pls.' Mem. Opp'n Def.'s Mot.

Summ. J. ("Pls.' Opp'n"), ECF No. 119; Pls.' Statement Disputed

Material Facts Opp'n Def. Fidelity Management Trust Company's

Mot. Summ. J., and Pls.' Resps. Fidelity's Statement Undisputed

Material Facts Supp. Mot. Summ. J. ("Pls.' Statement Facts"),

ECF No. 120; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem."),

ECF No. 98; Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply"),

ECF No. 130; Statement Undisputed Material Facts Supp. Def.

Fidelity Management Trust Company's Mot. Summ. J. ("Def.'s

Statement Facts"), ECF No. 99; Def. Fidelity Managements Trust

Company's Resp. Pls.' Statement Disputed Material Facts ("Def.'s

Resp. Facts"), ECF No. 131.

### B. Factual Background

The Portfolio is a stable value fund ("SVF").  Pls.'

Statement Facts 33 ¶ 26; Def.'s Statement Facts ¶ 26.  SVFs are

one of the most conservative options in which 401(k) plan

participants can invest, Pls.' Statement Facts 28 ¶ 5; Def.'s

Statement Facts ¶ 5, usually holding a portfolio of high-

quality, diversified fixed income securities, Pls.' Statement

Facts 28 ¶ 7; Def.'s Statement Facts ¶ 7.  SVFs also make use of

wrap contracts, Pls.' Statement Facts 28 ¶ 7; Def.'s Statement

Facts ¶ 7, a form of insurance coverage that guarantees

withdrawing investors the book value of their investment if the

SVF has been exhausted, subject to certain exceptions.  Pls.'

Statement Facts 29 ¶ 13; Def.'s Statement Facts ¶ 13.  Wrap

contracts include investment guidelines that impose limitations on the composition of the SVF's underlying portfolio of investments, Pls.' Statement Facts 31 ¶ 20; Def.'s Statement Facts ¶ 20, and do not guarantee that investors will earn a return on the principal that they invest, Pls.' Statement Facts 32 ¶ 25; Def.'s Statement Facts ¶ 25.  Breaches of wrap contract guidelines can result in termination of coverage.  Pls.' Statement Facts 44 ¶ 70; Def.'s Statement Facts ¶ 70.

Fidelity is the trustee of the Portfolio, Pls.' Statement Facts 2 ¶ 6; Def.'s Resp. Facts ¶ 6, and has primary responsibility for the Portfolio's administration and the prudent investment of Portfolio assets, Pls.' Statement Facts 2 ¶ 7; Def.'s Resp. Facts ¶ 7.  Fidelity's management fee for the Portfolio is derived from the amount of assets under management ("AUM").  Pls.' Statement Facts 3 ¶ 13; Def.'s Resp. Facts ¶ 13.

The Portfolio is governed by the Declaration of Separate Fund ("DSF").  Pls.' Statement Facts 33 ¶ 30; Def.'s Statement Facts ¶ 30.  The DSF states that the Portfolio's primary investment objective is "'seek[ing] the preservation of capital as well as . . . provid[ing] a competitive level of income over time consistent with the preservation of capital,'" Pls.' Statement Facts 2 ¶ 8, 34 ¶ 31; Def.'s Statement Facts ¶ 31; Def.'s Resp. Facts ¶ 8, and that Fidelity must "use its best

efforts to maintain a stable net asset value of $1.00 per unit," Pls.' Statement Facts 34 ¶ 32; Def.'s Statement Facts ¶ 32.

Ellis and Perry each invested in the Portfolio through the Barnes & Noble 401(k) Plan.  Pls.' Statement Facts 36 ¶ 41; Def.'s Statement Facts ¶ 41.  Ellis invested in the Portfolio from 2009 to 2015, while Perry invested in the Portfolio between 2009 and 2013.  Compl. ¶ 12; Answer ¶ 12.

### 1.   The Portfolio's Benchmark

A portfolio performance benchmark loosely shapes SVF investors' expectations about the risks and returns that the portfolio manager will take when investing fund assets, Pls.' Statement Facts 37 ¶ 49; Def.'s Statement Facts ¶ 49, but does not limit the types of investments a fund can make -- in fact, fund managers at times invest in securities that are not included in the fund's benchmark, Pls.' Statement Facts 38 ¶ 50; Def.'s Statement Facts ¶ 50.

Fidelity used the Barclay's Government/Credit Bond Index 1-5 A ("1-5 G/C Index") or better as a benchmark to manage the Portfolio throughout the class period.  Pls.' Statement Facts 12 ¶ 52; Def.'s Resp. Facts ¶ 52.  The DSF also states that the Portfolio's assets "will be managed to approximate the interest rate sensitivity of the [1-5 G/C Index]."  Pls.' Statement Facts 34 ¶ 33; Def.'s Statement Facts ¶ 33.  "Interest rate sensitivity" is the weighted average duration of the securities

in a portfolio.  Pls.' Statement Facts 35 ¶ 34; Def.'s Statement Facts ¶ 34.  The longer the duration of a fixed income security, the more that its market value would generally be expected to change in response to changes in interest rates.  Pls.' Statement Facts 35 ¶ 34; Def.'s Statement Facts ¶ 34. Typically, long-term bonds have greater interest rate risk than short-term bonds, and an interest rate change will have a greater effect on the price of long-term bonds than short-term bonds.  Pls.' Statement Facts 38 ¶ 52; Def.'s Statement Facts ¶ 52.  Fidelity's stable value portfolio managers believe that interest rate changes are generally unforeseeable; thus they typically strive to keep the duration of each SVF within a band around the fund's benchmark.  Pls.' Statement Facts 39 ¶ 56; Def.'s Statement Facts ¶ 56.

Before and during the class period, Fidelity periodically explored changing the Portfolio's benchmark and regularly conducted quantitative analyses of potential alternative benchmarks, including their risks and the impacts changing the benchmark could have on the Portfolio's returns, duration, market-to-book ratio, and tracking error volatility.  Pls.' Statement Facts 40 ¶ 57; Def.'s Statement Facts ¶ 57.  The stable value portfolio managers evaluated both more and less aggressive benchmarks, but consistently decided to retain the 1-

5 G/C Index as the Portfolio's benchmark.  Pls.' Statement Facts
41 ¶¶ 59-60; Def.'s Statement Facts ¶¶ 59-60.

### 2.    The Portfolio's Management Process

A portfolio manager ("PM") evaluates potential investments
and investment strategies, and makes investment decisions for
Fidelity's SVFs.  Pls.' Statement Facts 47 ¶ 79; Def.'s
Statement Facts ¶ 79.  A portfolio's designated PM has final
decision-making authority with respect to that portfolio's
holdings, but works with other PMs to make investment decisions.
Pls.' Statement Facts 47 ¶ 81; Def.'s Statement Facts ¶ 81.
Fidelity's PMs sit next to each other on Fidelity's fixed income
trading floor, where they have informal conversations about
investment strategies and ideas amongst themselves, as well as
with other investment professionals.  Pls.' Statement Facts 49
¶¶ 86-87; Def.'s Statement Facts ¶¶ 86-87.

The Portfolio's investment decisions use Fidelity's
analytics and take into account the information provided by
numerous teams, Pls.' Statement Facts 62 ¶ 116; Def.'s Statement
Facts ¶ 116, including the fundamental research team, Def.'s
Statement Facts ¶ 94, and the fixed income trading team, id.
¶ 98.

The fundamental research team provides a ground-up approach
to credit research -- constructing Fidelity's own rating for
nearly every counterparty with which Fidelity transacts, id.

¶ 91 -- and adds a top-down aspect to the process by integrating sector and macroeconomic research, id. ¶ 92.  The team is comprised of around forty fixed income fundamental research analysts with various specialties.  Id. ¶¶ 89-90.  The analysts provide quantitative and qualitative research on various topics, such as an in-house assessment of the creditworthiness of issuers, details regarding particular debt offerings, events and conditions that could affect the performance of different asset classes, statistical analyses, and information about general macroeconomic events or conditions.  Id. ¶ 89.  The research team routinely summarizes this research into research notes, id. ¶ 93, which the PMs review on a regular basis to learn about the market and assess investment ideas, id. ¶ 94.

Fidelity's team of fixed income traders identifies opportunities for the PMs to purchase or sell fixed income securities, evaluates whether those opportunities are priced appropriately, and executes trades.  Id. ¶¶ 95-97.  The team is made up of about twenty traders with various specialties.  Id. ¶¶ 95-96.  Fidelity's PMs and other fixed income professionals host a daily morning meeting on the trading floor to discuss overnight events and market movements and present potential investment opportunities.  Id. ¶ 98.

Fidelity's senior management monitors and oversees the processes and judgments of the PMs with respect to potential

investments and investment strategies.  Id. ¶ 103.  The PMs meet
with Christine Thompson, Chief Investment Officer for Fidelity's
bond group, every six weeks or so to review the PMs' decision-
making, id. ¶ 131, and discuss the funds' performance and flows,
risk positioning, sector allocation, duration positioning, and
other issues, id. ¶¶ 133-34.  Fidelity also oversees its SVFs
through the Trust/Investment Oversight Committee ("TIC"), which
exercises the powers of the Board of Directors with respect to
supervision of the trust activities of Fidelity, including the
management of Fidelity's SVFs.  Pls.' Statement Facts 70 ¶ 135;
Def.'s Statement Facts ¶ 135.  The TIC reviews Fidelity's SVFs
at least twice per year, at meetings where at least one PM is on
hand to present.  Pls.' Statement Facts 71 ¶ 138; Def.'s
Statement Facts ¶ 138.  The discussions cover, inter alia,
performance, risk, investment strategy, benchmarks, investment
guidelines, asset allocation, wrap capacity, and compliance with
investment limitations of the SVFs, Pls.' Statement Facts 71
¶ 138; Def.'s Statement Facts ¶ 138, as well as duration and
sector allocation, Def.'s Statement Facts ¶ 139.  Fidelity's
Board of Directors also receives regular updates on the SVFs,
including the Portfolio.  Id. ¶ 140.

### 3.    Events During the Class Period

The interest rate level during the class period was the
lowest of any six-year period in history, Pls.' Statement Facts

82 ¶ 179; Def.'s Statement Facts ¶ 179, and it was not foreseeable in 2009 that interest rates would remain at historic lows for a six-year period, Pls.' Statement Facts 82 ¶ 180; Def.'s Statement Facts ¶ 180.  Throughout the class period, the Portfolio maintained a stable net asset value of $1.00 per unit and provided positive returns to investors; no Portfolio investors experienced any out-of-pocket losses.  Pls.' Statement Facts 85 ¶ 192; Def.'s Statement Facts ¶ 192.  The Portfolio also outperformed its stated benchmark, Pls.' Statement Facts 85 ¶ 193; Def.'s Statement Facts ¶ 193, and its crediting rate[1] improved relative to the median SVF's crediting rate from 2010-2014, Pls.' Statement Facts 85 ¶ 195; Def.'s Statement Facts ¶ 195.  During the class period, Fidelity took immense care to comply with its wrap contract guidelines, so as not to trigger termination of coverage due to a breach, Pls.' Statement Facts 44 ¶ 70; Def.'s Statement Facts ¶ 70; in fact, none of Fidelity's wrap providers ever claimed that Fidelity had

---

[1] A crediting rate is "the interest rate earned on the contract value (principal plus accrued income) expressed as an effective annual yield."  Leela Scattum & Nick Gage, Stable Value Crediting Rates, Galliard, 2 (March 2015), http://www.galliard.com/Publication-PDFs/Stable-Value-Crediting-Rates-March-2015.pdf.  Financial institutions use the crediting rate mechanism to smooth returns over the duration of an SVF so that the SVF is able to deliver bond-like returns at low volatility.  Id.  The crediting rate is calculated as "a function of the contract value of an investment contract, the market value of the underlying bond portfolio, and the yield and duration of the underlying bond portfolio."  Id.

liability to them for breach of wrap guidelines or any other reason, Pls.' Statement Facts 46 ¶ 77; Def.'s Statement Facts ¶ 77, nor did the Portfolio exceed its wrap guidelines' three-year duration ceiling at any point, Pls.' Statement Facts 44 ¶ 72; Def.'s Statement Facts ¶ 72.

In or around 2009, Rabobank and AIG -- two of Fidelity's wrap providers -- decided to exit the wrap business.  Pls.' Statement Facts 8 ¶ 32; Def.'s Resp. Facts ¶ 32.  In subsequent presentations, Fidelity portrayed the Portfolio as desirable to wrap providers, due in part to low probability of withdrawals, Pls.' Statement Facts 9 ¶ 35; Def.'s Resp. Facts ¶ 35, its conservative approach, and a "portfolio structure [that] minimizes risk to issuers," Pls.' Statement Facts 15 ¶ 67; Def.'s Resp. Facts ¶ 67.  Fidelity ultimately replaced Rabobank and AIG's wrap capacity with insurance from American General Life, Bank of Tokyo, and Prudential.  Pls.' Statement Facts 8 ¶ 32; Def.'s Resp. Facts ¶ 32.  Bank of Tokyo and Fidelity executed their first wrap contract in July 2012.  Pls.' Statement Facts 77 ¶ 159; Def.'s Statement Facts ¶ 159.

In March 2010, Fidelity stated that a best practice was consistent emphasis on capital preservation and that integrity of the underlying assets took priority over crediting rate. Pls.' Statement Facts 15 ¶ 68; Def.'s Resp. Facts ¶ 68. Fidelity also internally noted that clients and consultants had

concerns about low crediting rates.  Pls.' Statement Facts 16-17 ¶¶ 72, 74-76; Def.'s Resp. Facts ¶¶ 72, 74-76.  In fact, one Fidelity employee went as far as to note, in reference to a Portfolio competitor, that:

> They probably are more diversified than us.  They're more willing to use every tool available to them –– traditional GICs, separate account GICs, Mutual of Omaha.  They're certainly more flexible than we are. You'd think that given our size and our resources that we could do anything, but with us everything has to be done our way.  [The competitor] can also afford to put deposits into cash because their crediting rates don't suck.  The biggest difference between us and [them] though is that they care about this business in a way that we don't.  Stable value matters to them.  We can talk all we want about how we're the best (and in some ways we are), but the fact is that while we were selling everything in the meltdown our competitors stuck to their guns.  As a result, in many cases they are better off than we are.

Pls.' Statement Facts 17 ¶ 77; Def.'s Resp. Facts ¶ 77.

Concerns about the Portfolio's conservative approach and underperformance were echoed over the years.  In June 2010, a Fidelity document stated that clients were asking about alternatives given the Portfolio's conservative positioning and resultant underperformance versus peers.  Pls.' Statement Facts 18 ¶ 79; Def.'s Resp. Facts ¶ 79.  In September 2010, a Portfolio manager noted that the Portfolio's "[c]onservative positioning [was] increasingly difficult to defend as others were conservative as well and have higher yields."  Pls.' Statement Facts 18 ¶ 80; Def.'s Resp. Facts ¶ 80.  In March

2011, Fidelity continued to note that clients were concerned with the Portfolio's relative performance, and that "crediting rate pressure continues to persist." Pls.' Statement Facts 18-19 ¶ 83; Def.'s Resp. Facts ¶ 83. In May 2011, Fidelity's Sean Walker wrote an email to the PMs, noting that when Fidelity had obtained wrap capacity from JP Morgan prior to 2011, Fidelity had agreed to "overly stringent guideline terms." Pls.' Statement Facts 10 ¶ 44; Def.'s Resp. Facts ¶ 44. Fidelity had done this with the understanding that JP Morgan would make those wrap guidelines its industry standard, Pls.' Statement Facts 11 ¶ 45; Def.'s Resp. Facts ¶ 45; however, by November 2010, Fidelity felt that JP Morgan had not honored this commitment, and that Fidelity had gotten lower crediting rates than peers, Pls.' Statement Facts 11 ¶ 46; Def.'s Resp. Facts ¶ 46.

In November 2011, in response to a request for information from a wrap provider, Micheletti Decl., Ex. G, Dep. Ex. 14, at FIDELITY_0074207, ECF No. 121-7, Fidelity stated:

> Fidelity has always maintained a conservative posture in [its] stable value management, [and has] generally not had to change the way in which [it] manage[s] stable value assets. More specifically, based on [its] conservative approach, [Fidelity] ha[s] not been as significantly impacted by some of the policies that wrap providers are requesting of other managers. [Fidelity is] committed to maintain [its] conservative approach in managing stable value assets.

Pls.' Statement Facts 15 ¶ 69; Def.'s Resp. Facts ¶ 69.

In December 2011, Fidelity's communications with wrap
providers stated: "integrity of the underlying assets takes
priority over crediting rate (yield)."  Pls.' Statement Facts 10
¶ 42; Def.'s Resp. Facts ¶ 42.  As of March 2012, Fidelity
sought to leverage its conservative underlying portfolio in
order to obtain more wrap capacity.  Pls.' Statement Facts 10
¶ 43; Def.'s Resp. Facts ¶ 43.

In January 2012, an internal Fidelity email noted that the
"much more stringent guidelines" imposed by JP Morgan on
Fidelity had placed Fidelity's product in an uncompetitive
position.  Pls.' Statement Facts 19 ¶ 87; Def.'s Resp. Facts
¶ 87.  In February 2012, Fidelity noted that the crediting rate
for the Portfolio was "trending well below the industry."  Pls.'
Statement Facts 20 ¶ 88; Def.'s Resp. Facts ¶ 88.  Also in 2012,
Fidelity noted that its portfolios were more conservatively
positioned than key competitors, and that this had resulted in
lower crediting rates.  Pls.' Statement Facts 20-23 ¶¶ 89, 90,
95, 96, 102-03; Def.'s Statement Facts ¶¶ 90, 95, 96, 102-03;
Def.'s Resp. Facts ¶ 89.  This was repeated in 2015.  Pls.'
Statement Facts 21 ¶ 97; Def.'s Statement Facts ¶ 97.

In mid-2012, Fidelity changed the Portfolio's DSF
guidelines to impose a three-year duration limit, and changed
the fund's credit rating minimums from A- to BBB-.  Pls.'
Statement Facts 12 ¶ 51; Def.'s Resp. Facts ¶ 51.

Fidelity acknowledged that the Portfolio's "[i]nvestment performance ha[d] lagged competitors due to the highly competitive market and [Fidelity's] conservative portfolio structure." Pls.' Statement Facts 25 ¶ 115; Def.'s Resp. Facts ¶ 115. In late 2014, Fidelity began developing a new Stable Value Business Plan. Pls.' Statement Facts 24 ¶ 106; Def.'s Resp. Facts ¶ 106. The plan noted that to improve the Portfolio's competitive positioning, Fidelity would aim to negotiate with wrap providers to allow a longer duration and higher allocations to investment grade credit sectors, update benchmarks, and improve knowledge of the competitiveness and structural advantages of Portfolio pools. Pls.' Statement Facts 26 ¶ 117; Def.'s Resp. Facts ¶ 117. In 2016, Fidelity reported that the new business plan had resulted in improved Portfolio competitiveness. Pls.' Statement Facts 26 ¶ 119; Def.'s Resp. Facts ¶ 119.

### 4. Dr. Steven Pomerantz's Testimony

The Plaintiffs' expert, Dr. Steven Pomerantz, conceded that "[a] prudent stable value manager could decide that . . . the extra return that one gets . . . is not worth the tradeoff in greater volatility." Pls.' Statement Facts 79 ¶ 166; Def.'s Statement Facts ¶ 166. Dr. Pomerantz also testified that, hypothetically, economic circumstances could have occurred during the class period in which a conservative investment

approach like the Portfolio's would have outperformed SVFs with less conservative approaches.  Pls.' Statement Facts 79 ¶ 167; Def.'s Statement Facts ¶ 167.  He opined that all else being equal, the greater a portfolio's duration, the greater the magnitude of negative returns in the portfolio when interest rates rise, Pls.' Statement Facts 82 ¶ 178; Def.'s Statement Facts ¶ 178, and that prudent reasons for favoring a shorter duration benchmark would include concerns about difficulties in obtaining wrap capacity and an interest in presenting an attractive risk proposition to a prospective wrap provider, Pls.' Statement Facts 82 ¶ 181; Def.'s Statement Facts ¶ 181.

Dr. Pomerantz noted, however, that the 1-5 G/C Index is not a very common benchmark for SVFs.  Pls.' Statement Facts 12 ¶ 54; Def.'s Resp. Facts ¶ 54.  He testified that Fidelity did not need to extend the Portfolio's duration precisely to three years to manage the Portfolio prudently, but just needed "to follow a well-defined process."  Pls.' Statement Facts 83 ¶ 183; Def.'s Statement Facts ¶ 183.  Finally, he concluded that in his expert opinion, in comparison to the Portfolio, a prudent portfolio could have had (1) a larger allocation to government securities, (2) a smaller allocation to corporate securities, (3) a smaller allocation to asset-backed securities, or (4) a smaller allocation to mortgages.  Pls.' Statement Facts 84-85 ¶¶ 187-91; Def.'s Statement Facts ¶¶ 187-91.

## II.  ANALYSIS

Fidelity has moved for summary judgment on the Plaintiffs'
remaining claim for breach of fiduciary duty.  Def.'s Mem. 1.
Fidelity contends that the Plaintiffs have failed to establish a
breach of either the duty of loyalty or the duty of prudence.[2]
Def.'s Reply 1-2.  This Court agrees.

### A.  Standard of Review

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a).  The
moving party initially bears the burden of demonstrating that
"the nonmoving party has failed to make a sufficient showing on
an essential element of her case with respect to which she has
the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317,
323 (1986).  If the movant does so, then the nonmovant must set
forth specific facts sufficient to establish a genuine issue for
trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
U.S. 574, 586-87 (1986).  In reviewing the evidence, the Court
must "draw all reasonable inferences in favor of the nonmoving
party, and it may not make credibility determinations or weigh
the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530

---

[2] Fidelity also argues that the Plaintiffs' claim is
impermissibly based on hindsight.  Def.'s Mem. 15-19.  The Court
disagrees with this characterization and declines to address the
argument further herein.

U.S. 133, 150 (2000) (citations omitted).  "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a court cannot grant a motion for summary judgment.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

### B.   Fiduciary Duties Under ERISA

ERISA section 404(a), 29 U.S.C. § 1104(a), imposes two duties upon a fiduciary: the duty of loyalty and the duty of prudence.  See Bunch v. W.R. Grace & Co. (Bunch II), 555 F.3d 1, 6 (1st Cir. 2009).  To succeed on a claim for breach of duty, a plaintiff must show (1) that the defendant was "acting as a fiduciary of the Plan when it engaged in the conduct about which [the plaintiff] complains," Watson v. Deaconess Waltham Hosp., 141 F. Supp. 2d 145, 152 (D. Mass. 2001), aff'd, 298 F.3d 102 (1st Cir. 2002), and (2) that conduct sufficed to breach the fiduciary duty that ERISA imposes, id. at 154.  To determine whether a breach has occurred, a court looks to the totality of the circumstances, assessing both the substance of the transaction and the process leading up to it.  See Bunch v. W.R. Grace & Co. (Bunch I), 532 F. Supp. 2d 283, 288 (D. Mass. 2008), aff'd, 555 F.3d 1 (1st Cir. 2009).

### C.   Duty of Loyalty Claim

The Plaintiffs argue that Fidelity acted in its own self-interest by agreeing to overly stringent wrap insurance guidelines that sacrificed the competitiveness of the Portfolio

while allowing Fidelity to grow its AUM.  Pls.' Opp'n 15.

Specifically, the Plaintiffs allege that Fidelity had a

financial incentive to increase its stable value AUM and to

amass wrap capacity to improve its competitive position and

increase its management fees, and that Fidelity pursued these

aims rather than acting in the Plaintiffs' best interests.  Id.

at 16.  Fidelity responds that the Plaintiffs do not present

evidence that Fidelity put its interests ahead of the

Portfolio's, and thus cannot establish a breach of the duty of

loyalty.  Def.'s Reply 12.  Fidelity argues that because the

Plaintiffs have not disputed that SVFs need wrap coverage or

that Fidelity was facing the potential withdrawal of several of

the Portfolio's wrap providers in 2009, to prove a breach of the

duty of loyalty, the Plaintiffs need to show that the Portfolio

did not need additional wrap coverage and that the new wrap

guidelines to which Fidelity agreed were overly conservative.

Id. at 4-5.  Because the Plaintiffs fail to carry their burden

of proof, this Court grants summary judgment on the issue of

whether Fidelity breached the duty of loyalty.

    ERISA section 404(a) requires an ERISA fiduciary to honor

the duty of loyalty by "discharg[ing] his duties with respect to

a plan solely in the interest of the participants."  29 U.S.C.

§ 1104(a)(1).  This duty, however, is not limitless -- the First

Circuit has noted an accompanying benefit to the fiduciary is

not impermissible -- it more simply "require[s] . . . that the fiduciary not place its own interests ahead of those of the Plan beneficiary." Vander Luitgaren v. Sun Life Assurance Co. of Can., 765 F. 3d 59, 65 (1st Cir. 2014).  Accordingly, to succeed on a claim for breach of the duty of loyalty, a plaintiff needs to show that the fiduciary served an interest or obtained a benefit at the expense of the plan beneficiaries.  See Bunch I, 532 F. Supp. 2d at 291.

### 1.   Excess Wrap Coverage

Although the Plaintiffs emphasize facts that would normally lead to the reasonable inference that Fidelity acted to increase wrap capacity rather than to pursue the investors' interests, the Plaintiffs fail to carry their burden because they do not point to any excess wrap insurance for the Portfolio.  The Plaintiffs cite a Fidelity presentation that stated that "[w]rap capacity [was] priority #1; all investment changes essential to maintaining capacity and creating new capacity" and "[p]reservation of market/book risk trumps all other investment objectives."  Pls.' Statement Facts 9 ¶ 38; Def.'s Resp. Facts ¶ 38.  The Plaintiffs also stress that Fidelity portrayed the Portfolio as desirable to wrap providers, due in part to a low probability of withdrawals, Pls.' Statement Facts 9 ¶ 35; Def.'s Resp. Facts ¶ 35, its conservative approach, and a "portfolio

structure [that] minimizes risk to issuers," Pls.' Statement
Facts 15 ¶ 67; Def.'s Resp. Facts ¶ 67.

The parties, however, agree that in or around 2009,
Rabobank and AIG decided to exit the wrap business.  Pls.'
Statement Facts 8 ¶ 32; Def.'s Resp. Facts ¶ 32.  Both of these
companies provided wrap coverage for the Portfolio.  Def.'s
Reply 4 (citing Micheletti Decl., Ex. X, Dep. Ex. 65, at
FIDELITY_075041, ECF No. 121-25).  Although the Plaintiffs
assert that in 2009, the Portfolio was not affected by a lack of
wrap capacity because it was "open to new plans, business as
usual," Pls.' Statement Facts 8 ¶ 30, the Plaintiffs do not cite
evidence to support the argument that Fidelity did not need
replacement coverage or that the pending termination of Rabobank
and AIG's wrap coverage was no longer an issue for the
Portfolio.  In fact, Fidelity did not secure replacement wrap
coverage until 2012.  See Pls.' Statement Facts 77 ¶¶ 159-60;
Def.'s Statement Facts ¶¶ 159-60.  Even taking all reasonable
inferences in favor of the Plaintiffs, this Court cannot
conclude on the basis of the facts before it that the
Portfolio's need for replacement wrap coverage had somehow
dissipated.

Further, although the Portfolio's taking on of excess wrap
coverage would almost certainly raise doubts as to whether
Fidelity acted in the investors' best interests, the Plaintiffs

do not argue that this occurred.  Wrap insurance is a core
feature of SVFs.  Pls.' Statement Facts 28 ¶ 7; Def.'s Statement
Facts ¶ 7.  The Portfolio was at risk of losing wrap coverage
from two of its providers, see Pls.' Statement Facts 8 ¶ 32;
Def.'s Resp. Facts ¶ 32; Micheletti Decl., Ex. X, Dep. Ex. 65,
at FIDELITY_075041, until its eventual replacement in 2012, see
Pls.' Statement Facts 77 ¶ 159-60; Def.'s Statement Facts ¶ 159-
60.  Thus, the Portfolio faced a potential gap in wrap coverage
until 2012.  The Plaintiffs submit that Fidelity's alleged
single-minded pursuit of increased wrap capacity ran from 2009
to 2012, Pls.' Statement Facts 9 ¶¶ 37-38, the same time period
during which Fidelity was searching for replacement wrap
insurance.  The Plaintiffs fail, however, to explain how
Fidelity's obtaining replacement wrap coverage would put
Fidelity's interests ahead of the Plaintiffs'.  Accordingly,
even taking these facts in the light most favorable to the
Plaintiffs, the Plaintiffs have failed to show that there was a
conflict of interest in Fidelity's pursuit of wrap insurance for
the Portfolio, given that the Portfolio needed replacement
coverage.

## 2.  Unduly Conservative Wrap Guidelines

The Plaintiffs also fail to show that Fidelity entered into
unduly conservative wrap guidelines.  Although they assert that
Fidelity agreed to overly stringent wrap guidelines in order to

obtain more wrap capacity, Pls.' Opp'n 15, Fidelity successfully counters that the Plaintiffs have not set forth evidence that any of the Portfolio's wrap guidelines were unreasonable, Def.'s Reply 8-10.

As Fidelity notes, Dr. Pomerantz testified that he "d[id]n't think" he had any quarrel with the appropriateness of the wrap providers' guidelines with Fidelity, nor did he believe there was material or immaterial imprudence to them.  Id. at 8 (citing Jacob Decl., Ex. T, Pomerantz Dep. 263:21-264:25, ECF No. 109-21).  Further, the only wrap guidelines that the Plaintiffs address are those that Fidelity and JP Morgan negotiated in 2009,[3] Micheletti Decl., Ex. AG, Dep. Ex. 91, at FIDELITY_0154857, ECF No. 121-34.  Although a 2011 email retrospectively described JP Morgan's wrap guidelines as "overly stringent," Pls.' Statement Facts 10-11 ¶ 44; Def.'s Resp. Facts ¶ 44, both parties also acknowledge that when Fidelity agreed to those guidelines, it did so with the understanding that JP Morgan would apply the same guidelines to all other SVFs moving forward, Pls.' Statement Facts 11 ¶ 45; Def.'s Resp. Facts ¶ 45.

---

[3] Fidelity argues that these guidelines were negotiated and went into effect prior to ERISA's six-year statute of limitations, 29 U.S.C. § 1113(1), and thus are not actionable. Def.'s Reply 8.  Fidelity does not, however, cite evidence regarding the period during which the guidelines were in effect. Therefore, ERISA's statute of limitations is an inappropriate basis upon which to dispose of the issue on summary judgment.

Given these facts, it is not reasonable to infer that Fidelity viewed the wrap guidelines as overly stringent when initially agreeing to them.  Nor do the Plaintiffs point to any term or combination of terms within these guidelines that they assert is unreasonable.  Instead, they merely give the guidelines a conclusory label, but fail to argue why such a label is merited.  Furthermore, the Plaintiffs do not argue that Fidelity had other wrap insurance options with less stringent guidelines.  The lack of facts or any argument by the Plaintiffs to support the inference that Fidelity chose JP Morgan's more stringent guidelines over other options would almost certainly persuade a reasonable factfinder that other options did not exist.  This, combined with the Plaintiffs' refusal to challenge the wrap guidelines more specifically, causes the Court to conclude that the Plaintiffs have failed to carry their burden to establish that any of the guidelines were unreasonable.  Accordingly, this Court holds that there is not sufficient evidence to find that Fidelity breached its duty of loyalty.

### D.   Duty of Prudence Claim

The Plaintiffs assert that Fidelity breached the duty of prudence by structuring and managing the Portfolio with the intention that it underperform competing stable value funds, as particularly evidenced by Fidelity's chosen benchmark and delay in addressing the Portfolio's underperformance.  Pls.' Opp'n 18.

Fidelity counters that the record is full of evidence of Fidelity's robust decision-making and management process for the Portfolio -- a process which the Plaintiffs fail effectively to impugn.  Def.'s Reply 12-13.  Fidelity argues that because this process was procedurally prudent, this Court ought hold that Fidelity did not breach its fiduciary duties.  Def.'s Mem. 13-15.  The Plaintiffs respond that Fidelity's process and motives were self-interested and thus the process was not prudent. Pls.' Opp'n 17-18.  Although a procedurally prudent process is not enough to insulate a fiduciary's decisions, the Plaintiffs do not set forth sufficient evidence to establish that Fidelity acted with imprudence.

The duty of prudence requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This applies to a fiduciary's investment decisions, as well as to the fiduciary's continuing responsibility "to properly monitor investments and remove imprudent ones."  Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828-29 (2015).  To determine whether an ERISA fiduciary has breached the duty of prudence, courts consider "both the substantive reasonableness of the fiduciary's actions and the procedures by

which the fiduciary made its decision," Fish v. GreatBanc Tr.
Co., 749 F.3d 671, 680 (7th Cir. 2014), focusing on "whether the
fiduciary employed proper methods to investigate and evaluate
decisions regarding the plan and its assets," Glass Dimensions,
Inc., ex. rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr.
v. State St. Bank & Tr. Co., 931 F. Supp. 2d 296, 305 (D. Mass.
2013) (Tauro, J.).  "ERISA's prudence requirements 'are
satisfied if the fiduciary: (i)[h]as given appropriate
consideration to those facts and circumstances that, given the
scope of such fiduciary's investment duties, the fiduciary knows
or should know are relevant to the particular investment or
investment course of action involved,' and '(ii) [h]as acted
accordingly.'" Bunch I, 532 F. Supp. 2d at 291 (quoting 29
C.F.R. § 2550.404a-1(b)(1)).  The burden is on the Plaintiffs to
set forth sufficient evidence to show that Fidelity's action (or
inaction) was imprudent.  Cf. Kenney v. State St. Corp., 694 F.
Supp. 2d 67, 76 (D. Mass. 2010) (Saris, J.) (dismissing an
imprudence claim for the plaintiff's failure to allege
sufficient facts to demonstrate the defendant's imprudence).

   Merely following a procedurally prudent process is not
enough to establish that a fiduciary did not breach its duty.
See, e.g., Bunch I, 532 F. Supp. 2d at 288.  Rather, a court
must look to the surrounding circumstances before properly
determining whether a breach has occurred.  See id. (stating

that a court addressing a breach of fiduciary duty "look[s] at
the totality of the circumstances involved in the particular
transaction" (citing DiFelice v. U.S. Airways, Inc., 497 F.3d
410, 418 (4th Cir. 2007); Keach v. U.S. Tr. Co., 419 F.3d 626,
637 (7th Cir. 2005); Rogers v. Baxter Int'l Inc., No. 04-C-6476,
2007 WL 2908829, at *2 (N.D. Ill. Oct. 4, 2007))).

## 1.   The Portfolio's Benchmark

The Plaintiffs allege that Fidelity used an unduly
conservative benchmark that made it easier for PMs to receive
bonuses.  Pls.' Opp'n 15.  Fidelity responds that its process
for assessing the benchmark considered the relevant facts and
circumstances and that Fidelity acted accordingly.  Def.'s Reply
13-14.  Because the parties do not dispute the detailed
analytical process Fidelity utilized in continually assessing
the Portfolio's benchmark and the Plaintiffs do not submit
evidence that Fidelity acted unreasonably by retaining the 1-5
G/C Index, this Court grants summary judgment in favor of
Fidelity on the issue of whether the Portfolio's benchmark
violated the duty of prudence.

Fidelity's benchmark analysis process appears procedurally
prudent.  The parties agree that throughout the class period,
Fidelity periodically explored changing the Portfolio's
benchmark both to more and less aggressive options, regularly
conducting quantitative analyses of potential alternative

benchmarks, including their risks and the impacts changing the benchmark could have on the Portfolio's returns, duration, market-to-book ratio, and tracking error volatility.  Pls.' Statement Facts 40-41 ¶¶ 57, 59; Def.'s Statement Facts ¶¶ 57, 59.  In each instance, however, Fidelity decided to retain the 1-5 G/C Index as the Portfolio's benchmark.  Pls.' Statement Facts 41 ¶ 60; Def.'s Statement Facts ¶ 60.  Fidelity notes that the only challenge the Plaintiffs raise with this process is that it did not expressly integrate a comparison with competitors' returns into Fidelity's benchmark analysis.  Def.'s Reply 14.  Fidelity argues that the Plaintiffs' concession that Fidelity paid attention to its competitors' performance is enough to show that Fidelity was giving appropriate consideration to the relevant facts.  Id. (citing Pls.' Opp'n 11-12).  Indeed, it is not reasonable to infer that despite Fidelity's exhaustive benchmark evaluation process, the company made the decision to retain the 1-5 G/C Index in a vacuum, disregarding its competitors' performance, despite the process explicitly taking into account how the benchmark would impact the Portfolio's returns.

Additionally, the Plaintiffs do not effectively dispute that Fidelity acted reasonably in the circumstances.  Fidelity used the 1-5 G/C Index as the Portfolio's benchmark throughout the class period.  Pls.' Statement Facts 12 ¶ 52; Def.'s Resp.

Facts ¶ 52.   Although Dr. Pomerantz describes this index as
being "not a very common benchmark" for SVFs, Pls.' Statement
Facts 12 ¶ 54; Def.'s Resp. Facts ¶ 54, he also notes that
economic circumstances could have occurred during the class
period in which a conservative investment approach like the
Portfolio's would have outperformed SVFs with less conservative
approaches, Pls.' Statement Facts 79 ¶ 167; Def.'s Statement
Facts ¶ 167.   Given the uncertainty as to how the low interest
rate would change over the class period, Pls.' Statement Facts
82 ¶¶ 179-80; Def.'s Statement Facts ¶¶ 179-80, the increased
risk of negative returns in a longer-term portfolio should
interest rates rise, Pls.' Statement Facts 38 ¶ 52, 82 ¶ 178;
Def.'s Statement Facts ¶¶ 52, 178, the Portfolio's pressing need
for wrap insurance, Pls.' Statement Facts 8 ¶ 32; Def.'s Resp.
Facts ¶ 32, and the intensive analytical process Fidelity
repeatedly performed in assessing its benchmark, Pls.' Statement
Facts 40-41 ¶¶ 57-60; Def.'s Statement Facts ¶¶ 57-60, Fidelity
does not appear to have retained the benchmark unreasonably.
The Plaintiffs do not point to a specific moment when Fidelity
should have made a different decision nor to any particular
decision or set of decisions at all; rather, they vaguely
challenge the Portfolio's overall structure without reference to
any specific events.   This is simply not a sufficient basis on
which to construct a finding of imprudence.

### 2.   The Portfolio's Performance

The Plaintiffs argue that despite knowing that the Portfolio's crediting rates were uncompetitive, Fidelity refused to seek a competitive level of income.  Pls.' Opp'n 16. Fidelity responds that the Plaintiffs' assertion is at odds with the undisputed record.  Def.'s Reply 15.  The Plaintiffs again fail to marshal sufficient evidence to suggest that Fidelity acted unreasonably.

The parties agree as to some aspects of the Portfolio's investment decision process, <u>see, e.g.</u>, Pls.' Statement Facts 47 ¶¶ 79, 81, 49 ¶¶ 86-87, 62 ¶ 116; Def.'s Statement Facts ¶¶ 79, 81, 86-87, 116, but the Plaintiffs summarily respond that much of the process is not material to their claim, <u>see, e.g.</u>, Pls.' Statement Facts 46-66.  Instead, they again generally argue that the investment management process was guided by Fidelity's overarching desire to grow its wrap capacity.  Pls.' Opp'n 18. Fidelity sets forth evidence that it engaged in a comprehensive process of evaluating potential investment strategies and investments for the Portfolio.  <u>See</u> Def.'s Statement Facts ¶¶ 89-98, 131-40.  The Plaintiffs fail to dispute this evidence. Pls.' Statement Facts 50-53 ¶¶ 89-98, 69-72 ¶¶ 131-40.

The Plaintiffs attempt to use Fidelity's 2015 business plan to imply that Fidelity did not engage in any efforts to improve the Portfolio's crediting rate prior to 2015.  Pls.' Opp'n 13.

This effort, however, is negated by the undisputed facts that the Portfolio's crediting rate improved from 2010 to 2014, Pls.' Statement Facts 85 ¶ 195; Def.'s Statement Facts ¶ 195; Fidelity adjusted the Portfolio's holdings during the class period, Pls.' Statement Facts 66 ¶ 126; Def.'s Statement Facts ¶ 126; and that "there [was] an increase in the aggressiveness of the [P]ortfolio over time," Pomerantz Dep. 292:13-17, which was "certainly a movement towards increasing the risk of the [P]ortfolio," id. at 293:2-4.  In light of Fidelity's submissions regarding the Portfolio's investment process and the Plaintiffs' failure to refute these facts beyond bald assertions about Fidelity's motives, the Plaintiffs have not brought the adequacy of Fidelity's investment process into question.

Further, as Fidelity notes, the Plaintiffs do not point to any specific decision violating the duty of prudence.  Def.'s Reply 18.  In the face of an undisputed process for making investment decisions, the Plaintiffs cannot carry their burden by vaguely asserting that Fidelity breached the duty of prudence without explaining what action(s) could constitute the breach. Accordingly, the Court holds that the Plaintiffs fail to establish that Fidelity breached the duty of prudence in responding to addressing the Portfolio's investment performance.

### III.    CONCLUSION

For the foregoing reasons, the Court holds that the Plaintiffs have not made a sufficient showing for the Court to continue to entertain the claims against Fidelity.  Accordingly, this Court GRANTS Fidelity's motion for summary judgment, ECF No. 97.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE