1

```
1                  UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3                              No. 1:15-cv-14128-WGY

4


5    JAMES ELLIS, et al,
               Plaintiffs
6


7    vs.


8


9    FIDELITY MANAGEMENT TRUST COMPANY,
               Defendant
10


11
                          * * * * * * * *
12


13                    For Hearing Before:
                    Judge William G. Young
14          At Suffolk University Law School


15
                       Summary Judgment
16


17                 United States District Court
                   District of Massachusetts (Boston)
18                 One Courthouse Way
                   Boston, Massachusetts 02210
19                 Thursday, April 6, 2017


20
                          * * * * * * *
21


22          REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23                United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                 bulldog@richromanow.com


25
```

```
 1                    A P P E A R A N C E S

 2


 3    JASON H. KIM, ESQ.
         Schneider Wallace Cottrell Konecky Wotkyns, LLP
 4       2000 Powell Street
         Suite 1400
 5       Emeryville, CA 94608
         (415) 421-7100
 6       Email: Jkim@schneiderwallace.com
      and
 7    JEFFREY A. GORDON, ESQ.
         Zelle, LLP
 8       600 Worcester Road
         Suite 101
 9       Framingham, MA 01702
         (781) 466-0700
10       Email: Jgordon@zelle.com
         For Plaintiffs

11


12    GREGORY JACOB, ESQ.
         O'Melveny & Myers, LLP
13       1625 Eye Street, NW
         Washington, DC 20006
14       (202) 383-5504
         Email: Gjacob@omm.com
15    and
      JOHN J. FALVEY, ESQ.
16       Goodwin Procter, LLP
         100 Northern Avenue
17       Boston, MA 02210
         (617) 570-1000
18       Email: Jfalvey@goodwinprocter.com
         For Defendant

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2              (Begins, 2:20 p.m.)

 3              THE CLERK:  Ellis vs. Fidelity Management.

 4              THE COURT:  Would counsel introduce

 5   themselves.

 6              MR. JACOB:  Gregory Jacob for the defendant,

 7   Fidelity Management Trust Company.

 8              MR. FALVEY:  Also John Falvey, Goodwin

 9   Procter, for Fidelity.

10              MR. KIM:  Good afternoon, your Honor, Jason

11   Kim on behalf of the plaintiffs, on the plaintiff class

12   that's been certified.

13              MR. GORDON:  Jeff Gordon on behalf of the

14   plaintiffs.

15              THE COURT:  All right.

16          This is the defendant's motion for summary

17   judgment and I'll hear you.

18              MR. JACOB:  Thank you, your Honor.

19          Plaintiffs' sole claim is that Fidelity breached

20   its fiduciary duties by managing the Managed Income

21   Portfolio, or "MIP," a safe investment option with a

22   fully-disclosed investment strategy in a way that was

23   too safe.  Let me say that again.  401K funds are --

24              THE COURT:  I've read your briefs, you say it

25   there, you've now said it a second time, and you want to
```

1   say it a third.  But you argue.  Go ahead.

2            MR. JACOB:  Your Honor, MIP is that same

3   option that every 401K plan's required to have for

4   retirees and older investors, that they can use it as a

5   safe harbor in stormy markets to protect their

6   retirement.

7            THE COURT:  Isn't the nub of your argument

8   that even -- this is summary judgment so I have to take

9   everything their way.  If I take all their submissions

10  their way and draw the reasonable inferences their way,

11  this is insufficient to the evidence, there is not

12  sufficient evidence that Fidelity breached its duty of

13  prudence or loyalty.

14           MR. JACOB:  That's absolutely correct, your

15  Honor, there's no evidence at all to support their

16  loyalty claim or their prudence claim.

17       With respect to their prudence claim, your Honor,

18  they alleged Fidelity's safe strategy breached that duty

19  of prudence, that is as of January 1st, 2010, the

20  beginning of the class period, prudence required

21  Fidelity to make riskier investments.  This Court's

22  decision in **Bunch** provides the framework for deciding

23  that claim.

24       **Bunch** establishes two key principles for

25  evaluating it.  First, the Court should look at the

1    defendant's conduct to determine whether it used a

2    prudent process, and second, plaintiffs are not allowed

3    to second guess Fidelity's decisions reached through a

4    prudent process and judge them in hindsight based on

5    results.

6         Now, *Bunch's* hindsight prohibition means that

7    plaintiffs' prudence claim must be judged from January

8    1st, 2010, two years into the financial crisis, with no

9    knowledge of how future markets are going to perform.

10   What injunction, your Honor, are plaintiffs saying that

11   as of that day, knowing what was known then, that this

12   Court should have entered?

13        Had the Court read plaintiffs' expert report, the

14   Court would think that the injunction was more

15   securitized mortgages, the very instrument that caused

16   the whole financial crisis, and, by the way, the very

17   same lawyers have sued JP Morgan for doing exactly that,

18   but Fidelity had robust process on MIP's mortgage

19   allocation and they have essentially abandoned this

20   argument in their summary judgment opposition because

21   the whole premise is so obviously ridiculous.

22        In their briefs plaintiffs say that MIP's

23   benchmark is a rare and unusually conservative

24   benchmark, so perhaps the injunction would be "use some

25   other benchmark," but that theory can't survive *Bunch*

1    either.  Plaintiffs don't dispute that Fidelity had

2    robust process on MIP's benchmark, they don't dispute

3    they didn't examine alternatives, they didn't perform

4    quantitative analyses, they didn't look at risk-reward

5    tradeoffs, that's the undisputed record, and that's

6    exactly what *Bunch* says that a prudent fiduciary does,

7    it considers all those factors and comes to a considered

8    judgment.  Plaintiffs disagreed with Fidelity's decision

9    to retain that benchmark, but *Bunch* does not allow them

10   to get to a trial on that basis.  And it's pure

11   hindsight for them to say that some other benchmark,

12   which they don't specify, would have yielded higher

13   returns.  And, by the way, your Honor, if you look at

14   Paragraph 49 of plaintiffs' complaint, you'll see that

15   this benchmark, which they say was "rare and unusually

16   conservative," was actually commonly used by the stable

17   value industry following the financial crisis.

18        Plaintiffs' final process argument is that

19   Fidelity did nothing to improve its performance until

20   2015.  Here I suppose the injunction, if such an

21   injunction were permissible, would be "Do something."

22   But the record is filled with Fidelity doing something,

23   it did exactly what *Bunch* said it was supposed to do, it

24   looked at the alternatives, it weighed the risk-reward

25   tradeoffs, and it came to decisions.  That is *Bunch's*

1    very definition of a "prudent process."  There are no

2    disputed facts on that point.  And it's pure hindsight

3    for plaintiffs to now come in and say, "Well, we

4    disagree," when Fidelity, after a thorough analysis,

5    decided to stay in a more conservative direction.

6         Moreover there's lots of evidence in the record

7    that Fidelity didn't always decide to stay in a more

8    conservative direction, but rather at points added risk.

9    Their expert admits that every year, beginning in 2010,

10   Fidelity added risk into the portfolios.  The fact

11   sheets that are in the record before the Court show

12   there are significant shifts in investment allocations

13   during that period of time.  And it's undisputed that

14   MIP's returns improved every year of the class period.

15        Now plaintiffs are going to come up and they're

16   going to say, "Well, your Honor, ignore all that process

17   because that's not the decision we're challenging," what

18   we're saying is Fidelity shouldn't have been so

19   conservative, but when the Court hears that it needs to

20   realize that all within that record of a prudence

21   process was weighing risk-reward tradeoffs everyday,

22   "Should we be more risky?" "Should we be more

23   conservative?"  There's tens of thousands of pages of

24   Fidelity making that decision in that record.  And they

25   can't sidestep *Bunch* just by being vague and saying,

1    "Well, it was some decision that we're not going to

2    specify when it was made and therefore all the process

3    that Fidelity conducted is irrelevant."  Fidelity is

4    entitled to judgment on that claim.

5              THE COURT:  Thank you.

6              MR. JACOB:  Now with respect to the loyalty

7    claim, your Honor, plaintiffs invented this new and

8    unpleaded conflict theory in their summary judgment

9    opposition realizing that they had no prudence claim and

10   let me summarize their argument.

11        It's undisputed that --

12             THE COURT:  Briefly.  Go ahead.

13             MR. JACOB:  It's undisputed that every stable

14   value fund needs insurance coverage called wrap

15   contracts and plaintiffs argue that Fidelity

16   deliberately sabotaged its clients by agreeing to bad

17   contract terms so that it could get extra insurance

18   coverage for new clients.  Well, to begin with, your

19   Honor, that whole theory is just kooky.  What investment

20   manager sabotages its current clients and drives down

21   its performance in order to attract new clients?  And as

22   might be expected of a theory that just makes no sense,

23   there's no evidence to support it.

24        All that they point to, all that they have in this

25   record is evidence that Fidelity wanted to grow its

1    business.  Of course it did.  Every investment manager

2    wants to do that.  That doesn't get them to a trial.

3    What the First Circuit's decision in *Vander Luitgaren*

4    says they have to show in order to make out a loyalty

5    claim is that Fidelity took some action that harmed MIP

6    in pursuit of its own interests, and they have nothing

7    on that front.

8         Yes, Fidelity did negotiate more conservative

9    contracts in 2009 in order to get wrap coverage, but it

10   is undisputed in the record that MIP needed that

11   coverage between 2008 and 2009 when up to 60 percent of

12   its wrap coverage was in danger.  There is zero evidence

13   that Fidelity could have secured that wrap coverage on

14   better terms, their own expert admits that the terms

15   that we got it on were perfectly prudent.  The one

16   contract that plaintiffs actually attack was negotiated

17   in 2009 and there was zero evidence that any of the

18   coverage Fidelity got went to some new client.  There's

19   no evidence and Fidelity's entitled to judgment on the

20   claim.

21             THE COURT:  Thank you.

22        Mr. Kim.

23             MR. KIM:  Thank you, your Honor.

24        So I wanted to start by saying what our case was

25   and what it's not about, um, and this is right in the

1    complaint.  If you look at Paragraph 2, the theme of our

2    complaint was that Fidelity, um, imposed an excessively-

3    conservative approach in order to favor the interests of

4    wrap providers over the investors.  I can site to many

5    other paragraphs in the complaint where we make the same

6    point.  Obviously we did not have the level of detail

7    that we have now, but the core theory has been the same

8    from start to finish.

9          But turning to, um --

10              THE COURT:  How does that make sense?

11              MR. KIM:  Sure, your Honor.  And, you know,

12   this actually is a really good point about why this case

13   requires some fairly nuanced factfinding.  So let me

14   explain to you how this makes sense.

15         One, is Fidelity has admitted that a lot of the

16   plan sponsors don't understand this product very well.

17   Second, as Fidelity has also admitted, that because it

18   serves as a record keeper, so that is the person who

19   does the administrative work for the funds that offer

20   the stable value fund, there's a certain amount of

21   stickiness, it's not easy to change.  So if you're a

22   plan sponsor and assuming you're sophisticated enough

23   that you understand that you are getting a very subpar

24   product, you would not necessarily be in a position to

25   change right away.  And so I think it's a rational

1    tradeoff from Fidelity's point of view to say that, um,

2    "We can get away with some subpar performance and what's

3    more important to us than ensuring that the investors

4    get the best possible return is to make the wrap

5    providers happy, because they like us more than they

6    like our competitors, and we'll be first in line to get

7    wrap capacity, and that will allow us to start taking

8    business away from those competitors and being in a

9    position to grow the business."  So that is how it makes

10   sense, your Honor.

11        And I realized --

12            THE COURT:  I'm sorry, but to do that your

13   theory is that you're going to have poor performance?

14   That just flies in the face of logic, it seems to me.

15            MR. KIM:  Your Honor, yes, as I explained, and

16   I think we put some -- we went to great gains to explain

17   the background of this in our opposition.  The normal

18   competitive pressures of an investment product are

19   somewhat muted in this case for the reasons I expressed

20   before.

21            THE COURT:  And I can see that, but "somewhat

22   muted" doesn't extinguish them.

23            MR. KIM:  It doesn't extinguish it, your

24   Honor, but I know you realize -- you're thinking it's

25   counterintuitive, but let me just point out a few things

1    on the record here about the performance and along the

2    lines of the logic that you're setting out, "Well, why

3    didn't someone do something about this, why didn't

4    people start leaving this product en mass?"  And if you

5    look at Exhibit AO, which is an e-mail, what they say is

6    that the performance was in the bottom decile, that is

7    the bottom 10 percent.  That's pretty bad.  I think we

8    would all give that an "F" grade.  Fidelity's a very

9    fine company and I think we'd expect quite a bit more

10   from that.

11        Exhibit U -- I'm sorry, Exhibit BE, a consultant

12   points out that they're tracking about 30 stable value

13   funds and this performance is about at the bottom of

14   that.  And if you look at Exhibit U, this is an internal

15   document where they're discussing -- they're

16   memorializing sort of the internal discussions amongst

17   the portfolio managers, they note in that brief document

18   three times, um, that their rates are uncompetitive and

19   they also note that the range of stable value fund

20   returns that they're aware of are 1.80 to 4.30 and we're

21   at 1.80.  So that's just a part of the evidence that

22   we've put in about the poor performance.  So I don't

23   think it can be denied that there was very notably poor

24   performance and Fidelity itself noted that.

25        So the question then is "Why was there poor

1     performance, was the poor performance simply that they

2     didn't know what they were doing or was the poor

3     performance the result of strategic decisions that they

4     made for reasons other than trying to obtain the best

5     crediting rate for the investors?"  And we've put in

6     quite a bit of evidence suggesting, um, with respect to

7     this wrap capacity, um -- and I will refer you to

8     Exhibit AK, they describe that as a "Priority Number 1,

9     obtaining wrap capacity," their words, not our words.

10    One would think that your Priority Number 1 would be

11    achieving a good return for your investors, but they

12    were more interested in wrapping up and obtaining more

13    wrap capacity.

14         And, you know, I know what they're saying here, is

15    that wrap capacity was necessary to continue to operate

16    the fund, but that doesn't -- that's not the rationale

17    that's provided in the documents.  And if you look at

18    Exhibit F, they talk about their goal is to obtain

19    significantly more wrap capacity than competitors.  And

20    if you look at Exhibit O, um, they admit that what they

21    did is they accepted the more conservative guidelines in

22    exchange for getting more wrap capacity from wrap

23    providers.

24         So if you look at an overall pattern of conduct

25    and if you look at the documents -- and not only what

1    the documents say, but what they don't say, what they

2    don't say is "We're seeking the wrap capacity in order

3    to better serve our existing investors."

4              THE COURT:  Let me challenge you with the

5    defendant's question.

6              MR. KIM:  Sure.

7              THE COURT:  What is it -- and again it will be

8    in hindsight, but what is it, if we got to a trial here

9    and I was going to make an order, what order would you

10   have me impose upon them?

11             MR. KIM:  Sure, your Honor, and that's a good

12   question, it does go to what the case is about.  I mean

13   obviously our intent would be for an order finding that

14   there was a breach of a fiduciary duty.  But in terms of

15   forward-looking relief --

16             THE COURT:  And -- yes.

17             MR. KIM:  In terms of forward-looking relief,

18   what I would say is that no one denies the fact that as

19   of right now they did make changes, and we put a lot of

20   material in there about this brand new business planning

21   process in 2015 as an acknowledgement that their

22   existing processes were suboptimal.  They devoted some

23   effort to a firm-wide business planning process.  And

24   they noted as a result that their performance is

25   converging, and as far as I know to this day, right now

1    in 2017, they're performing about as well as an average

2    stable value fund.  But what we're concerned with is in

3    2010 through the present.  So the fact that it may have

4    been cured to some extent now doesn't negate the rest of

5    the claim.  So I don't know --

6              THE COURT:  Well, what would -- go back to

7    2010, what would I order?

8              MR. KIM:  Well, your Honor, I mean 2010

9    already happened, so you would order -- you would find

10   that there was a breach of fiduciary duty.

11             THE COURT:  No, but suppose that's the way he

12   --

13             MR. KIM:  Oh, back in 2010 what you would have

14   ordered?

15             THE COURT:  Right.

16             MR. KIM:  So had you been aware of all of the

17   circumstances that we've put in front of you where they

18   said that their business plan involved "favoring

19   interests of wrap providers versus the investors," you

20   would say "You need" -- like in *Bunch,* "You need perhaps

21   -- because it seems like your investment decisions are

22   infected by your desire to grow the business, you should

23   look into obtaining the services of an independent

24   fiduciary in 2010" --

25             THE COURT:  I see.  All right.

1          MR. KIM:   -- "to make sure that your decisions

2    are really in the best interests of the investors and

3    not your interests as a business."

4          THE COURT:   Thank you.   I'll take the matter

5    under advisement.

6               (Ends, 2:40 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5    do hereby certify that the foregoing record is a true

6    and accurate transcription of my stenographic notes

7    before Judge William G. Young, on Thursday, April 6,

8    2017, to the best of my skill and ability.

9

10

11

     /s/ Richard H. Romanow 08-03-17
12   _____
     RICHARD H. ROMANOW    Date
13

14

15

16

17

18

19

20

21

22

23

24

25